UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
ORLANDO DIVISION

JAIME ROLLE, as the Natural                    CASE NO: 6:23-cv-1950-ACC-RMN
Parent of K.R., a Minor,

       Plaintiffs,

v.

CITY OF ORLANDO, SERGIO
RAMOS, DOUGLAS
ANDREACCHI, ORLANDO
ROLON, and DENNIS TURNER,

       Defendants.
_____/

**DEFENDANTS SERGIO RAMOS AND DOUGLAS ANDREACCHI'S
MOTION FOR SUMMARY JUDGMENT**

Pursuant to Federal Rule of Civil Procedure 56, Defendants SERGIO RAMOS

("Ramos") and DOUGLAS ANDREACCHI ("Andreacchi"), by and through the

undersigned counsel, file this Motion for Summary Judgment and incorporated

Memorandum of Law and shows that the pleadings and record evidence demonstrate

that there is no genuine dispute as to any material fact and that the Defendants are

entitled to summary judgment as a matter of law.

**STATEMENT OF MATERIAL FACTS**

Unbeknownst to Ramos and Andreacchi, the morning of September 19, 2019

had begun at the Lucious and Emma Nixon Academy Charter School ("LENA") in

the same manner that had become nearly a daily occurrence, with K.R. exhibiting

behavioral issues (Stoute Dep. 18:8-13). On this particular morning, a LENA employee, testing coordinator Beverly Houston-Stoute ("Stoute"), had come outside during drop off to talk to a parent when she saw K.R. "going at it" with her teacher. (Stoute Dep. 7:20-22; 28:11-20). K.R. was fighting with the teacher because K.R. wanted to wear her sunglasses in class. (Stoute Dep. 29:3-6). Instead of talking to the teacher or following the rules, K.R. fought to get them back, grabbing her teacher, pulling her, scratching her. (Stoute Dep. 29:7-10). To stop the disruption at the school so the other students could continue learning, Stoute had to remove K.R. from the classroom. (Stoute Dep. 29:13 – 32:12). Eventually, Stoute and the teacher's aide manage to get a hold of K.R., who was still trying to fight the teacher, and move her towards the front office. (Stoute Dep. 29:19-24).

Once in the hallway, K.R. turned her aggression to Stoute and the teacher's aide. (Stoute Det. 29:24 – 30:2). After finally reaching the front office area, Stoute opened the door to stop the disruption from the outside. (Stoute Dep. 30:3-5). Unfortunately, just making it to the office area was not enough for K.R. (Stoute Dep. 30:5-15). This behavior from K.R. had become so frequent, the staff at LENA knew if they just put K.R. in the office area, she would try to run. (Stoute Dep. 30:13-15). They had to get K.R. to the third part of the office where they could let her go, with no kids or visitors around to be attacked by K.R. (Stoute Dep. 30:13-15; 31:14-17).

After getting K.R. into the first part of the office, K.R. grabbed and hit the teacher's aide. (Stoute Dep. 31:2-4). This caused Stoute to try to neutralize K.R.'s hands to get her to move to the other office. (Stoute Dep. 31:4-6). K.R. then kicked,

hit, and tried to bite the LENA staff, in an effort to get loose to run out the back door. (Stoute Dep. 31:8-12). Even after LENA staff were able to get her into the third part of the office, her extreme behavior continued. (Stoute Dep. 31:14-22). K.R. continued to try to run out of the door, so LENA staff had to take turns standing at the door to stop her. (Stoute Dep. 31:17-21). Unfortunately, whoever was at the door was "taking licks" from K.R. (Stoute Dep. 31:17-21).

There in the school's administrative office, where his post is located, is the first time Reserve Orlando Police Officer Dennis Turner ("Turner") interacted with K.R. that morning. (Turner Dep. 62:10-14; 65:11-15). K.R. had already been brought into the office, and she was "restrained by the principal on the floor." (Turner Dep. 63:2-7). Both the principal and K.R. were sweating from the struggle. (Turner Dep. 63:4-7). Turner described the situation as:

> She's out of control. The little girl was out of control and I'm not sure if the principal had any remedies other than restraining her. I didn't witness her punching or kicking any of the other teachers, but I just saw them on the floor for a while.

(Turner Dep. 63:9-13).

This lasted for five to ten minutes, "a long time to be struggling with someone, wrestling with someone." (Turner Dep. 63:14-16). At this point, Turner did not yet know that K.R. had battered at least three members of LENA's staff. (Turner Dep. 66:5-6). "[T]hey kept looking at me and said, can you do something with her? I'm like, no. Unless somebody says that they want to press charges for a battery or something, there's nothing I can do to help." (Turner Dep. 66:5-9).

3

With K.R. in the third part of the school's front office, Stoute attempted to contact K.R.'s family. (Stoute Dep. 32:2-8). Stoute called K.R.'s aunt and grandmama five or six times back-to-back and left a message, but no one answered the phone. (Stoute Dep. 32:8-10). Searching for adults in K.R.'s life to help, Stoute called her "uncle," but who is not her real uncle, who answered. (Stoute Dep. 32:19-33:2). While the school usually tries to only contact actual relatives, no one else was answering. (Stoute Dep. 32:20-22). As Stoute explained in her deposition,

> So we tried to keep people that wasn't really the relative out, but we needed -- I needed somebody to answer for her, because I -- to me, we needed some help because she wasn't calming down and she was just going around hitting all the adults because she couldn't get out or get whatever -- whatever her intent was. So I went and I called the uncle, I called the uncle's number, and he answered.

(Stoute Dep. 32:20 – 33:2).

Stoute informed him that K.R. was "hitting everybody" and told the uncle that K.R. could be in trouble, or even arrested if someone cannot come since she was not calming down. (Stoute Dep. 33:3-6). Unfortunately, he told Stoute that he did not get off work for 30 minutes. (Stoute Dep. 33:7-8). When pressed with the importance of having a family member come to the school now, he again told them he does not get off work for another 30 minutes, and then hung up. (Stoute Dep. 33:13-16). Without other options, Stoute tried to call the uncle back, but this time he did not answer. (Stoute Dep. 33:16-23).

At wits end and without any family members immediately able to help, the LENA administrators requested Turner to assist. (Dekmar Dep. 67:5-11). Ultimately,

Turner obtained a sworn statement from Stoute containing a "watered down" version of K.R.'s violence that morning, and Turner placed K.R. under arrest for battery. (Dekmar Dep. 73:21 – 74:23); (Stoute Dep. 27:6-17).

Her general behavior on September 19, 2019, and indeed her history at the school was corroborated by K.R.'s own recollection. When asked why she had been taken to the office that morning, she answered, "Like I was throwing another one of my tantrums, like this. I was, like -- I was, like, kind of bad, like, not really bad, like throwing my hands. I was kicking my feet. I was just screaming and crying. And then the teacher walked over to me, and I may or may not have accidentally hit her, I don't know." (K.R. Dep. 47:21 – 48:3).

The first time Ramos heard anything about this incident is when Turner got on the radio and told police dispatch that he needed a transport to "JAC"[1] and requested flex cuffs. (Turner Dep. 86:23 – 87:1); (Dekmar Dep. 79:2-3). As a reserve officer working a voluntary off-duty job at LENA, Turner did not have a patrol car, so he needed another officer to transport K.R. (Ramos Dep. 33:4-9). Upon hearing the age of the individual being arrested,[2] Ramos informed his sergeant, Andreacchi, that he was being dispatched to do the transport. (Ramos Dep. 33:17-23). At this point, neither

---

[1] JAC is an abbreviation for the Juvenile Assessment Center, which is enshrined in § 985.135, Fla. Stat., and comprises of community operated facilities and programs which provide collocated central intake and screening services for youth referred to the department.

[2] The depositions of Ramos and Andreacchi differ in that Ramos recalls that he told Andreacchi the juvenile was seven years old, while Andreacchi recalls being told that she was eight years old. (Ramos Dep. 33:17-23); (Andreacchi Dep. 50:4-5). The record is now clear that K.R. was six years old at the time.

Ramos nor Andreacchi were aware of the specific charges or underlying facts of this case. (Ramos Dep. 33:24 – 34:1). However, due to the age of the child, Ramos and Andreacchi discussed potential options and ultimately decided that Ramos would talk to Turner first, to get the facts and circumstances of the case. (Ramos Dep. 34:1-3).

Once Ramos got to the school, he asked Turner "if he was charging her with a felony because battery on a school official is considered a felony. And he said, 'No, he was just going to charge her with a misdemeanor.'" (Ramos Dep. 36:23 – 37:1). After some general discussion, Ramos said:

> "Dennis, I don't think they want us arresting kids this young, unless it's something severe or something very serious." He says, "It is serious." I said, "Well, are you charging her with a misdemeanor or the felony"? He said, "misdemeanor." And I, kind of, gave him the look. He's like, "Oh, she's out of control. She's hitting all the teachers, the principals. We can't control her." And I believe he said he had already notified grandma and that there was no other solution.

(Ramos Dep. 40:2-12).

When Turner told Ramos that, based on the circumstances he would proceed with the arrest, Ramos asked Turner to call Ramos's supervisor, Andreacchi, first. (Ramos Dep. 41:18-21). Once on the phone, Andreacchi spoke to Turner and told him that were where other potential options for the child, such as filing charges, giving a notice to appear, or just not arresting. (Andreacchi Dep. 54:23 – 55:11). Nonetheless, Turner, who had the most knowledge of K.R. and the situation, used his independent discretion to make the arrest telling Andreacchi, "No, this is severe. I have to do this." (Andreacchi Dep. 55:3). Importantly, while Andreacchi was the direct supervisor of Ramos, on September 19, 2019, Turner was not in Andreacchi's chain of command.

(Andreacchi Aff. 2:6); (Ramos Dep. 43:14-16).

Ultimately, Turner obtained a sworn statement from Stoute detailing K.R.'s violent behavior, and Turner placed K.R. under arrest for battery. (Dekmar Dep. 73:21 – 74:23). Turner incorrectly believed that Orlando Police Department ("OPD") policy required that all arrestees be handcuffed. (Turner Dep. 99:5-13); (Dekmar Dep. 119:5-24). At Turner's direction, Ramos gently placed the soft plastic flex cuffs on her wrists, using no force at all. (Dekmar Dep. 107:2-8); (Turner Dep. 113:8 – 114:15). Ramos then walked K.R. out of the school to his police cruiser and made the short drive to the JAC. (Ramos Dep. 56:15-21; 63:2-4). There, K.R. was uncuffed and released to her grandmother less than one hour later. (Dekmar Dep. 104:4-15).

Former La Grange, Georgia Police Chief Louis Dekmar ("Dekmar") was hired in this case by the Plaintiffs as a police practices/liability expert. (Dekmar Dep. 9:15-18). Mr. Dekmar has acknowledged under oath as to the arrest, the following: (1) the sworn statement of Stoute establishes the elements of battery (Dekmar Dep. 73:21 – 74:19); (2) probable cause existed for the arrest of K.R. (Dekmar Dep. 74:20-23); (3) no Florida or Federal law prohibited the arrest of anyone based on a minimum age (Dekmar Dep. 75:10 – 76:4); and (4) K.R.'s arrest by Turner was not unlawful (Dekmar Dep. 77:7-17).

Regarding the officers' use of flex cuffs, Dekmar testified the only potentially excessive force was the application of the flex cuffs. (Dekmar Dep. 107:18 – 108:4;

7

114:1-7). He agreed there was no other force utilized in making the arrest. *Id*. He also

acknowledged that Ramos was gentle during the entire interaction with K.R. (Dekmar

Dep. 107:2-12). Mr. Dekmar agreed that a six-year-old, like K.R., absolutely knows

how to unbuckle their seatbelt, and was more secure in the police cruiser with flex

cuffs on than without. (Dekmar Dep. 117:18 – 118:8). K.R., when asked about being

transported to the JAC and who was driving, acknowledged she would try to escape,

stating:

> But I didn't see if any -- but I didn't -- I didn't -- I forgot to look and like
> see if it was anyone's in the car with me because I was so focused on
> trying, like, to get out of the cuffs and get out of the car.

(K.R. Dep. 57:5-9).

It is further undisputed that other than some temporary discomfort, K.R.

suffered no lasting injuries to her wrists from the flex cuffs and did not receive any

medical treatment as a result of being placed in the flex cuffs. (Kirkland Dep. 96:15-

20; 97:2-15 - 98:5).

## MEMORANDUM OF LAW

### I.    Summary Judgment Standard.

The Federal Rule of Civil Procedure 56 is well established. The moving party

must demonstrate "that there is no genuine dispute as to any material fact and that the

movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Furthermore,

"For factual issues to be considered genuine, they must have a real basis in the record."

*Mann v. Taser Int'l, Inc.*, 588 F.3d 1291, 1303 (11th Cir. 2009) (quoting *Hairston v.*

*Gainesville Sun Pub. Co.*, 9 F.3d 913, 919 (11th Cir. 1993)). While most inferences are

8

drawn in favor of the non-moving party, that party still must present some affirmative evidence supporting its position to defeat an otherwise appropriate motion for summary judgment. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586-587 (1986) (non-movant must "do more than simply show there is some metaphysical doubt as to the material facts") (citations omitted); *Celotex Corp. v. Catrett*, 477 U.S. 317, 324-325 (1986) ("Rule 56(e) therefore requires the nonmoving party to…designate 'specific facts showing that there is a genuine issue for trial.'"); *Evers v. Gen. Motors Corp.*, 770 F. 2d 984, 986 (11th Cir. 1985) ("conclusory allegations without specific supporting facts have no probative value."). Stated alternatively, "[t]he mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986). The question at summary judgment is "whether the evidence presents a sufficient disagreement to require submission to the jury or whether it is so one-sided that one party must prevail as a matter of law." *Id.* at 251-252.

## II.    Qualified Immunity Standard.

"Qualified immunity gives government officials breathing room to make reasonable but mistaken judgments about open legal questions." *Lane v. Franks*, 573 U.S. 228, 243 (2014) (quotation marks omitted). "Qualified immunity protects government officials from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable

person would have known." *Garcia v. Casey*, 75 F.4th 1176, 1185 (11th Cir. 2023) (quoting *Pearson v. Callahan*, 555 U.S. 223, 231 (2009) (quotation marks omitted)). "For qualified immunity to apply, a government official must first establish that he was acting within his discretionary authority when the alleged wrongful acts occurred." *Id.* "That is easy here. Because making an arrest is within the official responsibilities of a [law enforcement officer], [the law enforcement officer] was performing a discretionary function when he arrested [the plaintiff]." *Crosby v. Monroe Cty.*, 394 F.3d 1328, 1332 (11th Cir. 2004). Once this threshold is satisfied, "the burden shifts to the plaintiff to establish that qualified immunity is inappropriate." *Garcia*, 75 F.4th at 1185.

> Under our precedents, officers are entitled to qualified immunity under § 1983 unless (1) they violated a federal statutory or constitutional right, and (2) the unlawfulness of their conduct was clearly established at the time.

> "Clearly established" means that, at the time of the officer's conduct, the law was sufficiently clear that every reasonable official would understand what he is doing is unlawful. In other words, existing law must have placed the constitutionality of the officer's conduct beyond debate. This demanding standard protects all but the plainly incompetent or those who knowingly violate the law.

*District of Columbia v. Wesby*, 583 U.S. 48, 62–63 (2018) (quotation marks and citations omitted).

The Eleventh Circuit has repeatedly provided three potential means for a plaintiff to meet the "demanding" "clearly established law" test:

> First, "materially similar" case law may give an officer fair notice that his conduct would violate a constitutional right.

Second, the plaintiff can show the existence of a broader, clearly established principle that should control the novel facts of his situation. In other words, even if there is no case law directly on point, general statements of the law contained within the Constitution, statute, or caselaw may sometimes provide "fair warning" of unlawful conduct.

Finally, in rare instances, an official may still have notice when his conduct so obviously violates a constitutional right."

Garcia, 75 F.4th at 1185 (*citing Mercado v. City of Orlando*, 407 F.3d 1152, 1159 (11th Cir. 2005) (citations and quotation marks omitted, alteration adopted). In the Eleventh Circuit, case law capable of establishing clearly established law is limited to decisions from the United States Supreme Court, the Eleventh Circuit, and the Florida Supreme Court. *Loftus v. Clark-Moore*, 690 F.3d 1200, 1206 (11th Cir. 2012).

Where the allegedly unconstitutional conduct was not clearly established, "lower courts 'should think hard, and then think hard again,' before addressing both qualified immunity and the merits of an underlying constitutional claim." *Wesby*, 583 U.S. at 62 n.7 (*quoting Camreta v. Greene*, 563 U.S. 692, 707 (2011)).

## III.    Counts I, II, and III Fail as a Matter of Law (Ramos).

Plaintiff has alleged three causes of action against Ramos, Count I, Excessive Force, Count II, False Arrest, and Count III, Malicious Prosecution. We begin our analysis with Count II, False Arrest.

As we discuss these counts, it is important to remember that while the arrest is supported by probable cause, Ramos is just an assisting officer. This distinction, discussed in further detail below, creates and even higher bar that Plaintiff must overcome to deny summary judgment. An arrest supported by probable cause does

not violate the Fourth Amendment. *Atwater v. City of Lago Vista*, 532 U.S. 318, 354 (2001). In fact, the existence of probable cause is a complete defense to a claim for false arrest. *Marx v. Gumbinner*, 905 F.2d 1503, 1505-06 (11th Cir. 1990); *see also United States v. Gonzalez*, 107 F.4th 1304, 1311 (11th Cir. 2024) (holding the Fourth Amendment permits a warrantless arrest for a misdemeanor offense even if the offense was not committed in the arresting officer's presence). Moreover, Florida law expressly permits a warrantless arrest for misdemeanor battery upon probable cause even where the offense was not committed in the officer's presence. *See* § 901.15(9)(a), Fla. Stat. (2019); *see also State v. L.L.*, 933 So. 2d 3 (Fla. 2d DCA 2006) (holding using physical force on a teacher is a forcible felony under Florida law).

Here, the undisputed record evidence shows that probable cause clearly existed for K.R.'s arrest, a fact specifically admitted by Plaintiff's own expert, Louis Dekmar. Mr. Dekmar also acknowledged this arrest was not unlawful. Additionally, Florida caselaw specifically acknowledged there was no minimum age prohibition on the arrest of juveniles. *Southland Corp. v. Bartsch*, 522 So. 2d 1053, 1055-56 (Fla. 5th DCA 1988). Officers have discretion to make arrests where probable cause exists. *Everton v. Willard*, 468 So. 2d 936, 938 (Fla. 1985) (Recognizing the discretionary power to make an arrest is critical to a law enforcement officer's ability to carry out his duties).

Assuming, *arguendo*, that this Court finds that the low burden of probable cause was not fully met, for qualified immunity to attach, "an officer need not have actual probable cause, but only 'arguable' probable cause." *Brown v. City of Huntsville, Ala.*, 608 F.3d 724, 734 (11th Cir. 2010). "Arguable probable cause exists where reasonable officers in the same circumstances and possessing the same knowledge as the Defendants could have believed that probable cause existed to arrest Plaintiff." *Id.* (quotation marks omitted). "Indeed, it is inevitable that law enforcement officials will in some cases reasonably but mistakenly conclude that probable cause is present, and in such cases those officials should not be held personally liable." *Id.* at 734–35 (quotation marks omitted).

The Plaintiff's burden to overcome qualified immunity is even higher for assisting officers, like Ramos.

> Assisting officers are "entitled to qualified immunity when there is no indication that they acted unreasonably in following the lead of a primary officer or that they knew or should have known that their conduct might result in a [constitutional] violation, even when the primary officer is not entitled to qualified immunity."

*Smith v. Confreda*, 2016 WL 3344481 (M.D. Fla. 2016) (*citing Shepard v. Hallandale Beach Police Dep't*, 398 Fed.Appx. 480, 483 (11th Cir. 2010) and *Brent v. Ashley*, 247 F.3d 1294, 1306 (11th Cir. 2001) (finding that officers who assisted in an unauthorized strip search and x-ray were entitled to qualified immunity because they did not act unreasonably and had no reason to suspect plaintiff's constitutional rights were being violated)).

Like all modern Fourth Amendment jurisprudence, the "standard is an objective one and does not include an inquiry in to the officer's subjective intent or beliefs." *Brown*, 608 F.3d at 734-35. While reasonable people may disagree whether that discretion should have been utilized in this case, without dispute, probable cause existed for the arrest, and accordingly, Plaintiff's claim for false arrest must fail.

We next turn to Count III, Malicious Prosecution. The establishment of probable cause also vitiates the claim for malicious prosecution, and therefore Ramos is also entitled to summary judgment on this count. "In order to establish a federal malicious prosecution claim under § 1983, a plaintiff must prove (1) the elements of the common law tort of malicious prosecution, and (2) a violation of her Fourth Amendment right to be free of unreasonable seizures." *Paez v. Mulvey*, 915 F.3d 1276, 1285 (11th Cir. 2019) (quotation omitted). Under Florida law, the elements of malicious prosecution are:

> (1) an original judicial proceeding against the present plaintiff was commenced or continued; (2) the present defendant was the legal cause of the original proceeding; (3) the termination of the original proceeding constituted a bona fide termination of that proceeding in favor of the present plaintiff; (4) there was an absence of probable cause for the original proceeding; (5) there was malice on the part of the present defendant; and (6) the plaintiff suffered damages as a result of the original proceeding.

*Id.* at 1291 (quoting *Durkin v. Davis*, 814 So. 2d 1246, 1248 (Fla. 2d DCA 2002)).

For the purposes of summary judgment as to Ramos, we assume that K.R. satisfies elements one, three, and six. Still, the facts contained within the record cannot support the second, fourth elements, and fifth elements.

14

To satisfy the second element, the plaintiff must establish that the present
defendant, here Ramos, was the legal cause of the original proceeding. The Eleventh
Circuit has made it clear that only the officer who makes the decision to prosecute can
be liable.

> [W]e have held that defendant police officers were not the legal cause of
> the original proceeding where there was no evidence that they had
> anything to do with the decision to prosecute or that they had
> "improperly influenced" that decision….

*Williams v. Miami-Dade Police Dep't.*, 297 F. App'x 941, 947 (11th Cir. 2008). The record
here is undisputable. Turner had made the decision to arrest K.R. before he got on the
radio asking for a transport officer. Once involved, Ramos provided Turner with other
options, including not arresting K.R. and conferred with his sergeant, Andreacchi,
who also discussed those other options with Turner. Nevertheless, Turner ultimately
decided to exercise his discretion to effectuate a physical arrest. The record is devoid
of any facts that could support the position that Ramos was the legal cause of the
original proceeding.

Additionally, the fourth element also fails as arguable probable cause entitles
Ramos to qualified immunity from the malicious prosecution claim for the same
reasons outlined above for Count II. *Durkin v. Davis*, 814 So. 2d 1246; *see also Mack v.
Mazzarella*, 554 F. App'x 800, 802–03 (11th Cir. 2014) (where arguable probable cause
vitiated § 1983 malicious prosecution claim).

Likewise, the fifth element must follow. "Because legal malice may be inferred
from a lack of probable cause, gross negligence, or great indifference to persons,

property, or the rights of others, the analysis largely mirrors that of the probable cause analysis and will not be repeated herein." *Francois v. U.S.*, 2023 WL 2715822 (Fla. S.D. 2023).

We now turn to Count I, Excessive Force. As discussed below, here, the only conceivable use of force was the gentle application of flex cuffs, which under the constitutional standard falls well short of excessive. Excessive force claims are measured under the landmark test announced in *Graham v. Connor*, 490 U.S. 386 (1989). "As in other Fourth Amendment contexts, however, the 'reasonableness' inquiry in an excessive force case is an objective one: the question is whether the officers' actions are 'objectively reasonable' in light of the facts and circumstances confronting them, without regard to their underlying intent or motivation." *Id.* at 397. "[I]ts proper application requires careful attention to the facts and circumstances of each particular case, including [1] the severity of the crime at issue, [2] whether the suspect poses an immediate threat to the safety of the officers or others, and [3] whether he is actively resisting arrest or attempting to evade arrest by flight." *Id.* at 396.

The only conceivable use of force here is the use of flex cuffs. "We have long and repeatedly recognized that when making a custodial arrest, some use of force is necessary and altogether lawful." *Huebner v. Bradshaw*, 935 F.3d 1183, 1191 (11th Cir. 2019) (quotation marks omitted). "Officers routinely pull arrestees' arms behind their backs, and we have repeatedly held that painful handcuffing alone doesn't constitute excessive force." In *Huebner*, for example, the court concluded that "[e]ven though Huebner exhibited no meaningful flight risk, and even though her crime [of simple

16

battery, *id.* at 1185] was relatively minor, the force employed by McDonough here wasn't remotely unusual or disproportionate." This was despite the plaintiff's allegations that she was left handcuffed in a patrol car for two hours in such a way that she suffered "'significant, permanent and debilitating injuries,' including severe neck damage, shoulder pain and numbness, as well as the need for disc-replacement surgery." *Id.* at 1190; *see also Rodriguez v. Farrell*, 280 F.3d 1341, 1351–52 (11th Cir. 2002) (no excessive force where officer "grabbed plaintiff's arm, twisted it around plaintiff's back, jerk[ed] it up high to the shoulder and then handcuffed plaintiff as plaintiff fell to his knees screaming that [the officer] was hurting him.").

Certainly, the principles above apply to arrests generally, and we are evaluating the arrest of a six-year-old girl. But absent that fact, which is certainly central to the case, there is otherwise no question about the constitutionality of the arrest. Put another way, if K.R. were an adult and all other facts were the same, a § 1983 action would be downright frivolous. To defeat qualified immunity, Plaintiff must therefore proffer some clearly established law that transforms a plainly constitutional arrest to an unconstitutional one purely due to K.R.'s age.

But, at the time of this event, there was nothing categorically unlawful, let alone unconstitutional, about the arrest of a child solely due to their age. The K.R. Act,[3] passed in 2021, itself draws the line at seven, and even there, exceptions are made for

---

[3] The K.R. Act, codified as § 985.031, Fla. Stat. (2021), states "A child younger than 7 years of age may not be arrested, charged, or adjudicated delinquent for a delinquent act or violation of law based on an act occurring before he or she reaches 7 years of age, unless the violation of law is a forcible felony as defined in s. 776.08."

17

forcible felonies. In fact, the law of Florida has long permitted custodial arrests of six-year-olds for misdemeanors. *See Southland Corp. v. Bartsch*, 522 So. 2d 1053 (Fla. 5th DCA 1988). In *Southland*, a kindergartener stole "a package of gum from a 7-Eleven store," was custodially arrested, and taken to the police station. *Id.* at 1054. After the criminal case was dropped due to "the extreme youth of the offender," an action was brought for false imprisonment, malicious prosecution, and intentional infliction of emotional distress. *Id.* at 1055. A jury awarded damages (though it found for the defense on the false arrest claim), but the Fifth District reversed with instructions to enter judgment for the defense. *Id.* at 1056.

The appellate court reasoned that because the Florida statutes *and state Constitution* permit the charging and arrest of children under eighteen, the child's "age is irrelevant to the arrest and initiation of juvenile proceedings." *Id.* at 1055.[4] "Further, malice and a favorable determination of the criminal proceedings is insufficient to show a lack of probable cause," which the defendants clearly had. *Id.* at 1055–56. "The conduct in this case was clearly within 7-Eleven's legal rights and the testimony of [the store manager] and [the child] indicates that the rights were asserted in a permissible way." *Id.* at 1056. Thus, while *Southland* was not a formal civil rights decision, it provides strong evidence that reasonable officers in Turner's position would have reasonably believed that arresting a six-year-old for a misdemeanor was supported by the law. *See generally Alday v. Groover*, 601 F. App'x 775 n.1 (11th Cir. 2015) ("In

---

[4] The K.R. Act has naturally modified this statement of Florida law.

addressing the issue of clearly established constitutional law, we have 'taken note of the perspective of reasonable jurists who have attempted to articulate the legal landscape in non-binding precedent.") (quoting *Denno v. Sch. Bd. of Volusia Cty.*, 218 F.3d 1267, 1272 (11th Cir. 2000)).

In fact, the Eleventh Circuit has quoted *Southland* in reversing a jury verdict. *See Von Stein v. Brescher*, 904 F.2d 572, 584 (11th Cir. 1990). While *Von Stein* did not involve the arrest of a minor, it evaluated charges and public media announcements concerning a prostitution statute. *Id.* As with *Southland*, the key determination was the existence of probable cause; that finding alone vitiated the claim for intentional infliction of emotional distress. *Id.* Further, the Eleventh Circuit's publication of a block quote expressly discussing the *Southland* six-year-old's age is at least evidence that federal law does not categorically proscribe such arrests.

It must be noted that there is at least one § 1983 case that proscribes the handcuffing of a minor. That case, *Gray ex rel. Alexander v. Bostic*, involved the handcuffing of a nine-year-old student. 458 F.3d 1295 (11th Cir. 2006). However, unlike the situation at hand, that case did not involve even a claim that the child was handcuffed for the purpose of effectuating a criminal arrest. There, a student refused to do jumping jacks during gym class, and the coach verbally disciplined her. *Id.* at 1300. The student responded rudely with a verbal threat that she would "do something" to him, which the court construed as a physical threat. *Id.* at 1300–01. A second coach instructed the student to come over to her, and the first coach returned to his class. *Id.* at 1301. But before the student reached the second coach, an on-duty

19

school resource officer ("SRO") who witnessed the exchange intervened and said he

would handle it. *Id.* The second coach "insisted that she would handle the matter,"

but the SRO instead escorted the student outside the gym. *Id.* The SRO handcuffed

the student for five minutes telling her, "this is how it feels when you break the law"

and "this is how it feels to be in jail," causing the girl to cry. *Id.*

In litigation, the SRO testified that the purpose of the handcuffs was to "impress

upon her the serious nature of committing crimes" and to "rid herself of her

disrespectful attitude." *Id.* Neither coach believed that the student would or even could

carry out her "threat." *Id.* at 1302. Although the SRO believed that the student had

committed a misdemeanor, the SRO admitted that he never intended to arrest the

student, and the court therefore construed the handcuffing to have taken place during

an investigatory stop. *Id.* While handcuffing during a *Terry* stop can be permissible, it

is only so "when the officer reasonably believes that the detainee presents a potential

threat to safety." *Id.* at 1305–06. The problem for the SRO in *Gray* was that, at the time

of the handcuffing, "there was no indication of a potential threat to anyone's safety."

*Id.* at 1306. In fact, the court continued that the handcuffing violated clearly

established law for the following reasons:

> We likewise conclude that Deputy Bostic's conduct in handcuffing Gray,
> a compliant, nine-year-old-girl <u>for the sole purpose of punishing her</u> was
> an obvious violation of Gray's Fourth Amendment rights. … Deputy
> Bostic's purpose in handcuffing Gray was not to pursue an investigation
> to confirm or dispel his suspicions that Gray had committed a
> misdemeanor. Rather, Deputy Bostic's purpose in handcuffing Gray was
> simply to punish her and teach her a lesson. Every reasonable officer
> would have known that handcuffing a compliant nine-year-old child <u>for
> purely punitive purposes</u> is unreasonable. <u>We emphasize that the Court</u>

is not saying that the use of handcuffs during an investigatory stop of a nine-year-old is always unreasonable, but just unreasonable under the particular facts of this case.

*Id.* at 1307 (emphasis added throughout).

As a result, *Gray* holds that an officer who handcuffs a child solely to "teach them a lesson" violates the Fourth Amendment. The Eleventh Circuit drove this home on a subsequent post-judgment appeal, "conclud[ing] that, viewing the evidence in the light most favorable to Deputy Bostic, he lacked even arguable probable cause to arrest Gray." 264 F. App'x 856, *1 (11th Cir. 2008) (emphasis added).

Accordingly, Ramos is entitled to summary judgment.

## IV.    Count IV Fails as a Matter of Law (Andreacchi).

At the core of Count IV, Plaintiff alleges that Chief of Police Orlando Rolon ("Rolon") and Andreacchi caused K.R.'s alleged constitutional deprivations by condoning or failing to stop the actions of Turner and Ramos, specifically "the Supervisory Defendants approved, endorsed, and/or condoned the arrest and charging of K.R. in the manner detailed above." (Dkt. 28, 22:144).

Supervisory officials cannot be held liable for unconstitutional actions by their subordinates based on respondeat superior or vicarious liability. *Hartley v. Parnell*, 193 F.3d 1263, 1269 (11th Cir. 1999). There are two potential theories of supervisor liability, failure to intervene or failure to stop. "The difference between a direct failure to intervene claim and a failure to stop claim under a theory of supervisory liability lies in the position and authority of the defendant with respect to the person who commits the constitutional violation." *Keating v. City of Miami*, 598 F.3d 753, 765 (11th

Cir. 2010). Under either theory, "[t]he standard by which a supervisor is held liable in [his] individual capacity for the actions of a subordinate is extremely rigorous." *Cottone v. Jenne*, 326 F.3d 1352 (11th Cir. 2003) (quotation marks omitted) (second alteration in original) (abrogated on other grounds).

A failure to intervene case can be brought when "an officer who is present at the scene and who fails to take reasonable steps to protect the victim of another officer's use of excessive force[ ] can be held liable for his nonfeasance." *Baker v. City of Madison*, 67 F.4th 1268, 1281 (11th Cir. 2023) (alteration original) (quotation marks omitted). Here, there is simply no evidence that Andreacchi was ever present at the scene. As such, a claim for failure to intervene is without any merit.

Therefore, the only plausible theory against Andreacchi is that he failed to stop Turner from effectuating the arrest of K.R. However, before any liability can attach under a supervisory liability theory, Plaintiff must get past the threshold of showing that there is a constitutional violation. "Plainly, an officer cannot be liable for failing to stop or intervene when there was no constitutional violation being committed." *Sebastian v. Ortiz*, 918 F.3d 1301, 1312 (11th Cir. 2019). For the reasons stated in section III, above, Andreacchi is entitled to summary judgment under this count. Where "the amended complaint fails to allege a constitutional violation committed by the supervisory defendants, we need not reach the 'clearly established law' prong of the qualified immunity inquiry with respect to supervisory liability. *Cottone*, 326 F.3d at 1362.

Nevertheless, even if Plaintiff could show a constitutional violation, the claim against Andreacchi would still fail for the following reasons. "[S]upervisors are liable under § 1983 either when the supervisor personally participates in the alleged constitutional violation or when there is a causal connection between actions of the supervising official and the alleged constitutional violation." *Keating,* 598 F.3d at 762. Here, the record is clear that Andreacchi was not on scene and did not personally participate in the arrest of K.R. That only leaves the "causal connection" prong. "A causal connection can be established by, inter alia, facts which support an inference that the supervisor directed the subordinates to act unlawfully or knew that the subordinates would act unlawfully and failed to stop them from doing so." *Id.* The clear facts support the opposite. Instead of directing Turner to arrest K.R., he provided alternatives and even tried to talk Turner out of making the arrest. Thus, the only theory left is that Andreacchi failed to stop the arrest.

The Eleventh Circuit has expounded a two-part test for liability under a failure to stop claim:

> "A failure to stop claim under a theory of supervisory liability only requires that the supervisor (1) have the ability to prevent or discontinue a known constitutional violation by exercising his or her authority over the subordinate who commits the constitutional violation, and (2) subsequently fails to exercise that authority to stop it."

*Keating*, 598 F.3d at 765.

Here, it is important to recall that Andreacchi is not in Turner's chain-of-command and, as such, he simply did not have the authority to stop Turner from effectuating the arrest. *See Brown*, 608 F.3d at 737 ("However, [supervisory defendant]

was not [arresting officer's] supervisor or even in [his] chain of command. [Arresting officer] had his own authority to arrest and actually utilized it at the scene."). This is also true for the case at hand. Andreacchi was not Turner's direct supervisor. Turner had independent authority to arrest and exercised it, even after conversations with both Ramos and Andreacchi.

Finally, to the extent that Plaintiff alleges supervisory liability for Andreacchi's failure to obtain authorization from a watch commander, OPD's policy is simply not relevant to a § 1983 case. The only question is whether the conduct violated a clearly established constitutional requirement. *See Rooney v. Watson*, 101 F.3d 1378, 1381 (11th Cir. 1996) (The [Plaintiffs] also assert that [Defendant] maintained a custom or policy of allowing patrol vehicles to drive recklessly. Consequently, they argue that they should be able to establish their section l983 claim based upon [Defendant's] custom or policy that led to their constitutional deprivation. As the district court correctly pointed out, an inquiry into a governmental entity's custom or policy is relevant only when a constitutional deprivation has occurred.).

Accordingly, Andreacchi is entitled to summary judgment.

Based on the foregoing, Defendants, SERGIO RAMOS AND DOUGLAS ANDREACCHI, respectfully requests this Court enter an Order granting its Motion for Summary Judgment, and for such other and further relief as the Court deems just and proper.

**I HEREBY CERTIFY** that on February 3, 2025, I electronically filed the foregoing with the Clerk of the Courts by using the CM/ECF system which will send

a copy to all registered attorneys/parties to this suit.

*/s/ Alexander J. Karden*
Alexander J. Karden, Esq.
Florida Bar No. 84380
Assistant City Attorney
P.O. Box 4990, 3rd floor
Orlando, FL 32802-4990
Tel. (407) 246-2295
Fax: (407) 246-2854
akardenpleadings@orlando.gov
alexander.karden@cityoforlando.net
*Attorney for Defendants Sergio Ramos*
*and Douglas Andreacchi*