**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**
**ORLANDO DIVISION**

**JAIME ROLLE, as the Natural**
**Parent of K.R., a Minor,**
         **Plaintiff,**

**v.**                                 **Case No. 6:23-cv-1950-ACC-RMN**

**CITY OF ORLANDO, SERGIO**
**RAMOS, DOUGLAS ANDREACCHI,**
**ORLANDO ROLON, and DENNIS**
**TURNER,**
         **Defendants.**

_____

**ORDER**

This cause comes before the Court on the Motions for Summary Judgment filed by Defendants Officer Dennis Turner (Doc. 89), Officer Sergio Ramos, and Sergeant Douglas Andreacchi (Doc. 90); as well as the City of Orlando (the "City") and (former) Chief Orlando Rolon (Doc. 92). Plaintiff has timely filed Responses in opposition (Docs. 111, 112, 113) and Defendants have filed their respective Replies. (Docs. 118, 119, 121). The Motions are ripe for review.

For the reasons set forth below, Officer Turner, who arrested K.R., will be denied qualified immunity on Plaintiff's claims for the false arrest and excessive force for handcuffing of K.R. (Counts I and II). The assisting Officer, Serigo Ramos, will be granted qualified immunity on the false arrest and excessive force claims,

and both Officers (Turner and Ramos) will be granted summary judgment on Plaintiff's claim for malicious prosecution (Count III) because K.R. was arrested without the requisite "legal process" as a basis for such a claim. Summary judgment on Plaintiff's claims of supervisory liability (Count IV) will be granted to Sergeant Andreacchi, who had no authority to order Reserve Officer Turner not to arrest K.R., and to Chief Rolon who was not involved in K.R.'s arrest and learned of it belatedly.

Finally, summary judgment will also be granted on Plaintiff's claims for *Monell* liability against the City (Count V) because there is no evidence of a "widespread pattern" of untrained officers unlawfully arresting young children. The City is not liable for failure to train Officer Turner, who was not placed at the charter school by the City as a "school resource officer." Officer Turner undisputably failed to follow the City's requirement that *every* officer obtain watch commander approval before arresting a juvenile, or he would have been prevented from arresting K.R.; this failure to follow policy led to his immediate termination as a reserve officer for the City and an Internal Affairs investigation of the incident.

## I.    BACKGROUND

### A. Procedural History

This action involves the warrantless arrest of a female first-grade student, K.R., at a charter school. K.R.'s mother, Plaintiff Jaime Rolle, filed suit in her representative capacity in state court on August 30, 2022, and amended her

Complaint on September 18, 2023 to allege federal civil rights claims; Defendants removed the lawsuit to this Court on October 9, 2023 (Doc. 1; Doc. 12 (Second Amended Notice)).

Plaintiff filed her operative Second Amended Complaint on December 7, 2023 alleging § 1983 constitutional claims for excessive force, false arrest, and malicious prosecution against the off-duty reserve officer at the school, Officer Dennis Turner, who arrested K.R., and the transporting officer, Officer Sergio Ramos (Counts I, II and III); supervisory liability against Sergeant Douglas Andreacchi, and the City's former Chief of Police Orlando Rolon (Count IV); as well as a *Monell* claim for municipal liability against the City (Count V). (Doc. 28).

On February 3, 2025, Defendants filed separate Motions for Summary Judgment. (Doc. 89, 90, 92). On March 16, 2025, Plaintiff timely filed her Responses in opposition (Docs. 111-113), and on March 31, 2025, Defendants filed their respective Replies. (Docs. 118, 119, 121).

### B. Factual Background

The incident at the heart of this case arises from the misdemeanor arrest of a six-year-old first grader at the Lucious & Emma Nixon Academy (the "School"), a

public charter school, in Orlando, Florida.[1] (Doc. 89-7 (Stoute Dep.[2]) at 15, 107).

K.R., who weighed approximately 50 pounds and stood 3' 11" at the time,[3] was

arrested by Officer Dennis Turner, and was transported to the Juvenile Assessment

Center by Officer Sergio Ramos, after he discussed the situation with his supervisor,

Sergeant Douglas Andreacchi. The essential facts of K.R.'s behavior at the School

leading up to the incident are undisputed and there are body worn camera ("BWC")

videos of the point at which Officer Turner arrested K.R.

### K.R.'s Medical and Behavioral Conditions Prior to Arrest

K.R.'s grandmother and primary caregiver at the time, Meralyn Kirkland, had

started receiving reports of K.R. misbehaving and sleeping during the school day

outside of normal naptime hours when K.R. was in kindergarten at a public

elementary school, before starting first grade at the charter School. (Doc. 89-5

(Kirkland Dep.) at 46-50). In spring 2019, while K.R. was still in kindergarten at the

previous school, she was diagnosed with enlarged adenoids that caused her to have

---

[1] The Lucious & Emma Nixon Academy Charter School is a public school that operates under a "performance contract" or "charter" approved by the School Board of Orange County Public Schools ("OCPS") to serve students in kindergarten through fifth grade who live in Orange County. *See* https://www.nixonacademyorlando.org/ (visited July 9, 2025). Plaintiff's statement that Defendant Turner began working at the School "for the City of Orlando" is therefore erroneous. The Court may take judicial notice of facts when the fact "is not subject to reasonable dispute." Fed. R. Evid. 201(b).

[2] Although the City's Motion to file the video deposition of Ms. Stoute under seal was granted (Doc. 120), the Motion was withdrawn on June 24, 2025 (Doc. 126), and the video was never filed. The Court reviewed only the written transcript of Ms. Stoute's deposition.

[3] (Doc. 89-1 at 57; Doc. 111-1 (ICJIS Arrest Aff.); Doc. 28 at ¶ 50).

issues from sleep disruption; Ms. Kirkland referred to this as "sleep apnea" (*Id.* 46-50), though that was not the formal medical diagnosis in K.R.'s medical files (as described by the forensic psychologist). (Doc. 93-1 (Dr. Day Dep.) at 24, 29).[4] The sleep disturbance, in turn, caused K.R. to be significantly "cranky" as Ms. Kirkland described it, which led K.R. to have outbursts and misbehave at school; K.R's adenoid surgery was eventually scheduled for October 2019, which her grandmother believed would alleviate her sleep problems.[5] (*Id.* at 50, 53, 56, 59).

Ms. Kirkland filled out a form indicating the medical conditions she believed that K.R. had, but she did not provide the actual medical records to the School; the School told her at the open house that they would be able to obtain K.R.'s previous

---

[4] Plaintiff's clinical forensic psychologist, Dr. Day, opined that K.R. had "pre-existing behavioral and potential medical problems" before attending the charter School and her guardians "had identified an issue with her adenoids, snoring and sleep disruption and were trying to deal with her disruptive behavior . . . from a behavioral and a medical standpoint." (Doc. 93-1 (Dr. Day Dep.) at 24, 29; Doc. 57-1). However, Dr. Day testified that although doctors tested K.R., the sleep apnea studies in K.R.'s medical records from March and April 2019 by Dr. Garcia were "normal" but "she had enlarged adenoids [] causing her to snore and not sleep well. So it wasn't sleep apnea per se, but it was her adenoids, and she had an adenoidectomy" in October 2019. (*Id.* at 55-56).

[5] Although Kirkland frequently described the condition as "sleep apnea," she also described the explanation from doctors treating K.R.'s sleep issues as caused by enlarged adenoids, consistent with Dr. Day's forensic review of K.R.'s medical records:

> [She] got like three hours or four hours of REM sleep a night, and at her age, she should've gotten 10 hours or something of REM sleep undisturbed. . . [T]he crankiness would persist throughout the day . . . so things that would not normally irritate [her] in the course of the day because [she was] sleep-deprived, they become irritants. . . [B]ecause it was only a brief nap [in kindergarten], but she needed more sleep to make up for what she lost the night before. . . . K.R. was scheduled—because she had the Medicaid, it was a long, drawn-out process to get the approvals etc. . . .[and] she was then approved for the surgery prior to the incident. . . .[The doctors] were trying to get it done as quickly as possible, [but] because . . . Medicaid is a very slow process there was nothing the physicians could do.

(Doc. 89-5 at 58-61).

academic record from Eccleston Elementary, the Orange County Public School where K.R. had attended kindergarten. (Doc. 89-5 at 68-69). Despite having "behavioral dysregulation" in kindergarten and first grade which might have warranted an Individualized Education Plan ("IEP") for children with medical conditions under the Individuals with Disabilities Education Act[6] or § 504 of the Rehabilitation Act,[7] K.R. did not have an IEP in place until she was eight years old. (Doc. 93-1 (Dr. Day Dep.) at 28-29 ("[T]he School had not identified her need for a 504 or an IEP for oppositional defiant disorder" by first grade); *id.* at 50 ("behavioral dysregulation" based on kindergarten record of hitting teachers and throwing chairs); *id.* at 31 ("IEP done at Lake Gem when she was eight"). Nor had K.R.'s "cumulative file" from Orange County Public schools reached the Charter School before she started first grade in August 2019 or during her five weeks of attendance there, so the charter School was unaware of her significant behavior issues in kindergarten at the previous school. (Doc. 89-7 at 55-56).

Around the time K.R. started at the School, Ms. Kirkland discussed K.R.'s sleep disturbance issues with the School staff who advised that they did not allow sleeping in first grade classes but, as they told her, "they would work out something to accommodate" K.R. (*Id.* at 71). However, Ms. Kirkland's opinion was that after

---

[6] 20 U.S.C. §§ 1400-1419.

[7] 29 U.S.C. § 794.

K.R. enrolled, "no accommodations were made" because of the School's small size, as Ms. Kirkland later learned, there was no room that could be dedicated for K.R. to nap or sleep in. (*Id.*).[8]

*K.R. Begins First Grade as a New Student at the Charter School*

Beginning on "day one" when K.R. became a new student enrolled in first grade at the charter School, administrators experienced repeated problems with K.R.'s behavior "everyday"; according to the administrators, K.R. was "totally out of control" and "was hitting adults, kids, everybody." (Doc. 89-7 at 9, 18, 61). K.R. would get physical, disrupt the classroom and other students, and she had to be suspended multiple times. (*Id.* at 63, 103; Doc. 79-1).

According to Ms. Kirkland, she called the School's dean (Ms. Whitlock) "everyday" when dropping K.R. at school to update her on whether K.R. had experienced a good or bad night regarding her sleep because K.R. would have behavior problems if "she woke up a lot of times during the night" and "got a lot less sleep." (Doc. 89-5 at 70). The dean would "keep an eye" on K.R., would bring her

---

[8] To the extent Plaintiff argues that the School staff agreed "based on specific recommendations from K.R.'s medical providers," to "allow K.R. to tire herself out through the tantrum[s]" and "try not to restrain her," there is no support in Plaintiff's citations to Kirkland's deposition testimony for any such statements. (*See* Doc. 111 at 3 (citing Doc. 89-5 at 72, 86)). Nor is there *any* medical evidence cited to support "not restraining" K.R. in the School setting where "elopement" or running out of the classroom presented a significant safety issue. (*See* Doc. 79-1). Kirkland's cited testimony relates exclusively to her conversations with the dean (Ms. Whitlock) about possibly letting K.R. *nap* in her office. (Doc. 89-5 at 72).

into her office,[9] and would call Ms. Kirkland "whenever there [was] an issue" and so they "were in constant contact." (*Id.* at 72, 76).[10] School staff told Ms. Kirkland that K.R. "would run away," "hide under the play set," or they would find her "in the bathroom asleep," but Ms. Kirkland testified that she was unaware that K.R. was "kicking and punching" the School staff. (Doc. 89-5 at 74).

In the five weeks of first grade at the School leading up to K.R.'s arrest on September 19, 2019, it is undisputed that School staff dealt with conduct including "running out of the classroom, being aggressive if she wasn't getting her way, yelling, screaming, going under the table, trying to harm other kids, [and] breaking other kids' stuff." (Doc. 89-7 at 72; Doc. 79-1). Because K.R.'s grandmother had informed the school that K.R. suffered from sleep-related issues, the school attempted to provide K.R. with additional naptime and "give her a sleep corner," to no avail. (Doc. 89-7 at 18.) According to one administrator, Ms. Stoute, the School staff "tried to figure out how to help K.R." with her sleep issues so they came up with a "plan to have the 'sleep corner' and take her there to see if she wanted a nap, however, when it was offered to her, she didn't want to take a nap" and "it was never

---

[9] Kirkland characterized this as "perhaps [Whitlock] securing a bean bag or something for the corner of her office where she could possibly let [K.R.] take naps. . . [s]o we had worked out what I thought was a plan." (Doc. 89-5 at 72-73).

[10] Kirkland's understanding was that a therapist was also "supposed to visit the school several times a week" to see K.R. and develop plans with the teacher to work through the "worst part of her day," but, according to Kirkland, the therapist was "not able to come on board" because there was no specific "plan in place" for such therapy. (*Id.* at 73). There was a behavioral therapist who visited periodically, according to other testimony from school staff. (Doc. 89-7 at 68-69).

because she was going to sleep in class." (Doc. 89-7 at 58). "[T]he dean at the time (Ms. Whitlock) would come and get her, walk with her, talk with her. Teach her different strategies of how to calm down," and they would "call the auntie and grandma, because they were the ones that had custody of her." (*Id.* at 19) ("[W]e did everything we thought we could possibly do . . . to help K.R.").

School records of administrators' communications and meetings[11] with Ms. Kirkland (Doc. 79-1) indicate K.R.'s behaviors and elopement from the classroom continued unabated during the five weeks of first grade K.R. attended the charter School, and it escalated until her last day at the School, September 20, 2019 (the day after her arrest). (Doc. 93-1 (Dr. Day Dep.) at 50 ("[H]er behavior was escalating" and her "behavior [had] becom[e] more aggressive with time.")). According to the School records, the School dean repeatedly called and texted Ms. Kirkland and other relatives listed as contacts regarding K.R.'s behavior: her "defiance," "tantrums," "screaming and running around" classroom, "elopement" from class on multiple days, "destruction" of classrooms, "shouting profanities," "attempting to hit classmates," and breaking another child's glasses. (Doc. 79-1). K.R. was suspended

---

[11] The evidence was produced in discovery as a business record of the school, *see* Fed. R. Evid. 803(6), and authenticated by a school administrator, Ms. Stoute, at her deposition. (Doc. 79-1 (Bates No. COO 7213-7219); Doc. 89-7 (Stoute Dep.) at 63-66). At summary judgment, "the court may consider any material that would be admissible or usable at trial including properly authenticated and admissible documents or exhibits." *Woods v. City of Chicago,* 234 F.3d 979, 987-88 (7th Cir. 2000); *Property Mgmt. & Inv., Inc. v. Lewis*, 752 F.2d 599, 604 n.4 (11th Cir. 1985) ("As a general rule, the court may consider on a Rule 56 summary judgment motion any material that would be admissible or usable at trial.").

from the School multiple times as a result. (*Id.*).

When Ms. Kirkland met with the principal and dean on August 21, 2019 to discuss K.R.'s behavior, she told them that K.R. had an appointment scheduled with the pulmonologist a few days later, and the administrators asked for "any documentation from any of the physicians and/or behavior specialist, so that [they] can put together an accurate and effective behavior intervention plan." (*Id.*). Two days later K.R. eloped from class, and five days later she eloped three times after exhibiting "defiant behavior," "destroying part of a classroom and shouting profanities," and she received a two-day suspension after School staff sent Ms. Kirkland pictures of the destruction. (*Id.*). On August 30, 2019, K.R. was defiant in class and broke another child's glasses; staff phoned Ms. Kirkland, discussed it with her, and sent her the video of the behavior and the broken glasses at Ms. Kirkland's request. (*Id.*). When K.R. "eloped" from class again and was "defiant" on September 5, 2019, the dean asked Ms. Kirkland to pick K.R. up for the rest of the day; she told Ms. Kirkland that "elopement was a major safety issue" and the dean was "not able to sit with [K.R.] all day to keep her from acting out." (*Id.*). On September 9, 2019, when K.R. refused to do work in class and was "attempting to hit" her classmates, she was suspended for the day and her uncle came to the School to pick her up.[12]

---

[12] Mr. Allen was the boyfriend of K.R.'s aunt and referred to as her "uncle," but was not an official guardian. (Doc. 89-7 at 33, 92).

On September 11, 2019, Ms. Whitlock informed Ms. Kirkland that she "needed documentation to support [K.R's] medical condition as cause for her behavior before [K.R. could] return to school due to the frequency of her incidents and the school not having the available staff nor time to sit with her all day." (*Id.*). In a return call, Ms. Kirkland expressed that "she was working with the physicians on getting the documentation and would appreciate the school's patience." (*Id.*).

The next day, September 12, 2019, the School's principal "reached out to [Orange County Public Schools] for support." (*Id.*). The following school day, on September 16, 2019, K.R. eloped from class three more times and had "verbal outbursts"; her uncle was called to "come assist with her behavior as an alternative to having to keep sending her home" and he stayed in class with her; Ms. Kirkland called the dean to discuss the incidents at the end of the day. (*Id.*).

The following day, on September 17, 2019, K.R. again eloped from class twice, with "verbal expletives," and "classroom destruction"; the school's mental health counselor and the dean "stayed with her monitoring and giving redirections to assure [K.R.'s] safety." (*Id.*). During the incident, K.R. had "eloped and was climbing on top of the bench and playground equipment"; her uncle "showed up in the middle of the attempt to deescalate the situation" and "[a]s an alternative to sending [K.R] home," he decided to stay and sit with her in class. (*Id.*). All of this conduct preceded K.R.'s arrest two days later, on September 19, 2019.

*Reserve Officer Turner*

At the time of K.R.'s arrest, Officer Turner was working as an off-duty reserve officer at the charter School. (Doc. 89-1 (Turner Dep.) at 27, 35–38). Officer Turner had retired from the Orlando Police Department ("OPD") in September 2018 after 24 years of service and continued to work as a reserve officer at the airport until the School hired him as an off-duty officer in August 2019 to provide armed campus security. (Doc. 89-1 (Turner Dep.) at 27, 35–38; Doc. 92-4 (Gabriel Aff.) ¶¶ 6-7).

Officer Turner first heard K.R.'s name on the radio on the second day of school, when someone said "K.R.'s out again" meaning that "she gets out, runs around" and "sometimes tries to leave the campus"; in the five weeks between the first day of school and the incident, the staff had asked Officer Turner to "talk to K.R." and he had done so on three or four occasions. (Doc. 89-1 at 58). Officer Turner had called K.R.'s grandmother several times over the weeks leading up to the arrest, but she had not answered. (Doc. 89-1 at 60).

*September 19, 2019 - The Day of K.R.'s Arrest*

On September 19, 2019, the day of K.R.'s arrest, Ms. Kirkland called the dean when dropping K.R. off to tell her that K.R. had not slept well. (Doc. 89-5 at 79). As the students were preparing to enter the first-grade classroom that morning, K.R.'s teacher told K.R. to take off the sunglasses she had worn to School, removed the sunglasses from her, and told her to sit down; K.R. began to punch, kick, and hit the

teacher. (Doc. 89-7 (Stoute Dep.) at 17, 28-29; Doc. 106-1 (Stoute Statement)). The
school administrator who served as the testing coordinator, Ms. Stoute, was on
"hallway duty" standing outside looking toward the entrance to the classroom when
she observed K.R. hitting her teacher while the other students were entering the
classroom. (Doc. 89-7 at 7, 28-29, 78). Ms. Stoute and the teaching assistant for
K.R.'s teacher tried to calm K.R. down by talking to her but she became louder and
more aggressive, so they removed K.R. from the front of the classroom and away
from the other children, and brought her down the hallway—"kicking and
screaming"—to the administrative office to calm her down; K.R. punched and hit
Ms. Stoute repeatedly and without interruption for the entire walk from her
classroom to the front office, though Ms. Stoute would "not say it hurt because it
didn't."[13] (Doc. 89-7 at 29-31, 80-81; Doc. 106-1). In the process of the staff
bringing K.R. from the classroom to the administrative office, K.R. pushed and
pulled away from the teacher's aide and attempted to run out of the office; Ms. Stoute
had to restrain her. (Doc. 106-1).

Once in the administrative office, K.R. responded by kicking, punching,
scratching, and attempting to bite Ms. Stoute, the principal, the dean, and the other

---

[13] To the extent Plaintiff states "K.R. calm[ed] down and walk[ed] with Ms. Stoute to her office" citing to Ms. Stoute's testimony, (*see* Doc. 111 at 5 (citing Doc. 89-7 at 91-92)), those facts are not supported by Ms. Stoute's testimony, which is that K.R. kicked and punched her as she was led to the front office, but K.R. had calmed down "15-20 minutes" *later*, by the time Officer Ramos arrived to transport K.R. (Doc. 89-7 at 91).

adults attempting to restrain her in the office so she could not run out. (Doc. 89-7 at 38-39, 82-85, 103, 120). The staff members restrained K.R. by holding her forearms, but she continued to fight and yell, resisting as the adults kept asking her to calm down, and she kept running into the other offices in the office area. (*Id.* at 85). Ms. Stoute had to block K.R. from leaving the room because of her history of "elopement" and running out of the classroom. (*Id.* at 84). Staff members moved K.R. to the rear (or "third") portion of the administrative office that was more secure so that less physical restraint would be required; despite repeated directions for K.R. to calm down and stop resisting, K.R. "proceeded to kick because she wanted to run back out the door and [the adults] had to stop her." (Doc. 89-7 at 31, 86; Doc. 106-1). When Ms. Stoute positioned herself in front of the door, K.R. became "aggressive hitting her with her hands in the chest and stomach area," kicking her, and trying to bite her. (Doc. 89-7 at 31, 35; Doc. 106-1). Even in the inner "third" part of the office, K.R. continued to try to run out of the door, so the staff members[14] took turns standing at the door, but "whoever was on the door at the time, got their licks from K.R." (*Id.* at 31). K.R. started to calm down while still restrained by the principal holding her arms. (*Id.* at 86).

---

[14] The staff dealing with K.R. that morning were the Principal (Ms. Hart), the Dean (Ms. Whitlock), the teacher's assistant, the registrar, and Ms. Stoute, who was the testing coordinator. (Doc. 89-7 at 33-34, 38-39).

K.R.—deposed five years after the incident[15]—admitted that on the day of her arrest she was having a "tantrum," swinging her arms, throwing her hands, and kicking her feet, screaming and crying, but she does not "remember hitting or kicking anybody purposely." (Doc. 89-4 (K.R. Dep.) at 47-48, 50, 53). Ms. Stoute testified that, after she moved K.R. to the front office, School administrators repeatedly called Ms. Kirkland and K.R.'s aunt "five or six times" back-to-back and left messages about K.R.'s behavior, but neither guardian answered their calls. (Doc. 89-7 at 32-33, 92). Administrators were able to contact K.R.'s "uncle" (who was listed as a contact on school records but not a guardian) and told him that K.R. was "acting up badly," "hitting everybody," "getting into big trouble, and it's a possibility that she could be arrested," and the School needed "somebody . . .  to get here like right now." (*Id.* at 33). He said he did not get off work for 30 minutes and hung up the phone. (*Id.*). When Ms. Stoute called him back a second time, he "stopped answering." (*Id.*). No family members answered their phones after Ms. Stoute talked to the uncle. (*Id.* at 33-34).

Ms. Kirkland testified that she had no access to her personal phone when not on a break at work;[16] thus, she had provided the School with her manager's phone

---

[15] K.R. was deposed in December 2024 at eleven years of age. (Doc. 89-4 (K.R. Depo.) at 8).

[16] Ms. Kirkland alleges that she never received any missed phone calls on her personal cell phone that day. (Doc. 89-5 at 86). Accepting non-movant's version of the facts, as the Court must do on summary judgment, the discrepancy is of no consequence, since Kirkland could not have answered any calls from the School on her personal phone until a break, based on her testimony.

number, and School staff ultimately ended up calling the manager's phone to reach

Ms. Kirkland. (Doc. 89-5 at 86). About an hour after beginning work on September

19, Ms. Kirkland's manager brought the phone to her, and she learned from Officer

Turner that K.R. had been arrested and was being transported to the Juvenile

Assessment Center ("JAC"). (*Id.* at 84, 88-89). When Ms. Kirkland told Officer

Turner that K.R. had the medical problem of "sleep apnea," Turner responded that

he also had sleep apnea, but did not act the way K.R. did. (*Id.* at 84; Doc. 89-1 at 60

("I told her I have sleep apnea, so I'm not sure that's correct.")). Ms. Kirkland ended

the call, hurriedly drove to pick up K.R. from the JAC, and learned that K.R. was

being charged with battery. (Doc. 89-5 at 88-89, 91-92).

*Officer Turner's Decision to Arrest K.R. and A Second Child (L.H)*

Officer Turner's post as armed security was at a desk in the School's

administrative office. (Doc. 89-1 at 64-65). On the morning of September 19, 2019

around 8:30 a.m., he saw the principal restraining K.R. for five to ten minutes, and

he could see that both she and K.R. were sweating from the exertion. (*Id.* at 62-63,

67, 69). During this incident, the staff members kept looking at Officer Turner and

asked him whether he could "do something with her?" and he replied that he could

not do "anything unless someone said that they wanted to press charges for a battery

or something." (*Id.* at 66). He viewed the problem with K.R. as a "procedural thing

that she [the principal] had to deal with" and the "little girl . . . wasn't committing

any crimes." (*Id.* at 63-64). Officer Turner said he could not "touch this girl unless she commits a crime . . . . Unless somebody says that they want to press charges for a battery or something, there's nothing [he] can do to help." (*Id.* at 63, 66).

Officer Turner did not consider the option for a juvenile civil citation or an at-large charging affidavit, which would not have resulted in K.R.'s immediate arrest, because, as he explained:

> K.R. was known to have her problems or issues. She'd calm down, but then she finds something else to get into as far as ramping up her -- her behavior – her behavior. So it wasn't a matter of trying to punish anyone. It was whether or not somebody committed a crime that day. And that's all that was.

(Doc. 89-1 at 71). Officer Turner testified that he did not witness K.R. punch, kick, or try to bite any of the school staff, but Ms. Stoute made a "verbal" victim statement to him before he determined that an arrest was necessary. (*Id.* at 67, 110). She did not complete a written statement until after K.R. was arrested. (Doc. 89-1 at 66, 110; Doc. 106-1). In Ms. Stoute's written statement, she did not specifically state that she wanted to press charges and she did *not* sign her initials on the part of the form that specifically said: "I will testify in court and prosecute criminally." (Doc. 106-1).[17]

---

[17] According to Ms. Stoute's sworn interview testimony with the OPD Internal Affairs investigators on September 26, 2019, as "the handcuffs were being put on" K.R., Ms. Stoute was "struggling" emotionally. (Doc. 111-4 at 7). She believed it to be a "terrible situation" that they "were all put into," but she thought "Officer Turner did what he . . . felt like he needed to do . . . [b]ecause [K.R.] battered everybody and she continue[d] to batter" in what was "just an ongoing situation." (*Id.* at 8).

Officer Turner's arrest affidavit for K.R. stated that "Assistant Principal/victim, Beverly H. Stoute stated both verbally [and] in a sworn written statement that Defendant K.R. kicked her on the leg several times and punched her several times on both arms without permission. Ms. Stoute further stated *she wanted to press charges and would testify in court*." (*Id.* at 69 (emphasis added)). Officer Turner determined that there was probable cause to arrest K.R. for misdemeanor battery because "if there's any unwanted touching and the victim states that they want to press charges, then you can make an arrest for the battery." (*Id.* at 70).

K.R. was not arrested immediately while she was being restrained from eloping in the inner office. By the time K.R. was taken into custody at 9:33 a.m., as Officer Turner explains, it "had been a while" since she had been restrained until "[s]he was physically arrested right before she was transported" to the JAC. (Doc. 89-1 at 85; Doc. 117-1 (timestamped "09:33")). "She calmed down as all the paper[work] was being generated" and Officer Turner thought "she was not sure whether or not she was going to be arrested, she didn't know," so when Officer Turner told her she was going to be arrested, "that's when she kind of fell apart." (Doc. 89-1 at 85).

Officer Ramos was assigned to a district that included the School, and he learned that Officer Turner had requested a transport officer to drive a child to the JAC because, as a reserve officer working an off-duty job at the School, Officer

- 18 -

Turner did not have a patrol car. (*Id.* at 86-87; Doc. 89-3 (Ramos Dep.) at 33).
Officer Turner asked Officer Ramos to bring flexicuffs for the child because her
wrists were "too small for the [regular] handcuffs"; this required Ramos to go to a
substation to grab the flexicuffs. (Doc. 89-3 at 33).

Upon hearing the young age of the child Officer Turner planned to arrest,[18]
Officer Ramos told his supervisor, Sergeant Andreacchi, about it. (Doc. 89-3 at 33,
36-37). Based on their discussion, Sergeant Andreacchi agreed that Officer Ramos
would find out from Officer Turner in person what the allegations were and then call
him. (*Id.* at 34, 37). When he arrived at the School, Officer Ramos spoke to Officer
Turner, telling him that he did not think their supervisors wanted them "arresting
kids this young, unless it's something severe or something very serious." (*Id.* at 39-
40). To which Officer Turner responded, "It is serious," but confirmed that he was
charging K.R. with a misdemeanor, not felony battery on a school official, and
Officer Ramos "gave him a look." (*Id.* at 40). Officer Turner responded "Oh, she's
out of control. She's hitting all the teachers, the principals. We can't control her."
(*Id.*). Officer Turner told Officer Ramos that "he had already notified grandma and
that there was no other solution." (*Id.*).

---

[18] Officer Ramos thought Officer Turner said K.R.'s age was seven (Doc. 89-3 at 33), but
the one-year age discrepancy is not material to the false arrest or excessive force analysis.

When Officer Turner told Officer Ramos that he was planning to proceed with the arrest even after Officer Ramos spoke with him, Officer Ramos told Officer Turner to call Ramos's supervisor, Sergeant Andreacchi.[19] (Doc 89-3 at 41). Sergeant Andreacchi was the patrol sergeant assigned to work in the Bravo area of the City (on the Bravo rotation) and the day shift who had direct supervision over patrol officers within his chain-of-command. (Doc. 90-8 ¶ 3). Although Sergeant Andreacchi was the direct supervisor of the transporting Officer Ramos on September 19, 2019, he was not the supervisor of the reserve officers like Officer Turner because Turner was not in Andreacchi's chain of command. (Doc. 90-8 at 2; Doc. 89-3 at 43-44). As a member of the Orlando Police Reserve Unit, Officer Turner was under the command of the Special Patrol Section Commander whose chain-of-command was within the Reserve ranks. (Doc. 90-8 ¶¶ 6-7).

Once on the phone, Sergeant Andreacchi spoke to Officer Turner and told him that there were potential options other than arrest for the child, such as filing charges, giving a notice to appear, or just not arresting. (Doc. 90-6 (Andreacchi Dep.) at 54-55). Officer Turner used his own discretion to make the arrest telling Andreacchi, "No, this is severe. I have to do this." (*Id.* at 55). Sergeant Andreacchi did not give Officer Turner the order to refrain from arresting K.R. because Andreacchi felt that

---

[19] It is undisputed that Sergeant Andreacchi was not at the School location and did not personally participate in the arrest of K.R. (Doc. 90-8 ¶ 8).

he personally had not done the investigation, he did not "know the ins and outs of

what occurred," and "the little [he] knew, it made the threshold of probable cause,

and officers have discretion on how they're going to handle situations. So [he] knew

there was probable cause" and believed that "what [Turner] wanted to do was

lawful." (*Id.* at 55-56, 74). Sergeant Andreacchi could not order Officer Turner to

"un-arrest" someone because that required approval at a higher level, from a

lieutenant. (*Id.* at 65).

Officer Ramos viewed the decision to arrest K.R. as Officer Turner's decision,

not Officer Ramos's and he was unhappy that Officer Turner did not find an alternate

solution because, in Officer Ramos's opinion, it was not necessary to arrest K.R.;

Officer Turner provided his signed and printed charging affidavit to Officer Ramos,

which was required to be presented at the JAC when Officer Ramos brought K.R.

there. (*Id.* at 56-58, 97-99). In the car on the way to the JAC, Officer Ramos called

Sergeant Andreacchi again, telling him that K.R. appeared "even smaller in person,"

but that Officer Turner was insisting on arresting her; Officer Ramos had been

dispatched to transport her so he "felt like [he] had no choice" since, legally, Officer

Turner "was allowed to make the arrest" and had conveyed to Officer Ramos that he

had probable cause because the School staff were "pressing charges and [K.R.] had

battered someone." (*Id.* at 59-61). Having received criticism from the intake

employees at the JAC about arresting a child K.R.'s age, Officer Ramos wrote on

the form to log her in at the JAC, "This is not my arrest" in capital letters and "I am only the transport officer." (*Id.* at 88).

On the same morning as K.R.'s arrest, Officer Turner made the decision to arrest a second six-year-old child (L.H.) who had misbehaved at the School. (Doc. 111-4). When the teacher of that child asked Officer Turner if the young boy would go to jail, Officer Turner told her that the arrest "was just to get help from [] the mom." (Doc. 111-4 at 5). Officer Turner told her, "Sometimes you have to make tough decisions to get things moving." (*Id.*).

The transporting officer for L.H. contacted her sergeant, who contacted the watch commander on duty and informed him of both arrests. (Doc. 105-1 (Unredacted IA Invest.) at 4). The watch commander, Lt. Donohue, immediately ordered that L.H. be "un-arrested" and returned to the school. (*Id.*). Lt. Donahue also called Officer Turner and ordered him to "un-arrest" K.R.[20] (Doc. 89-1 at 116-18). Officer Turner completed the paperwork to "un-arrest" K.R. and submitted it to intake, however, the "un-arrest" action is not immediate and takes a couple of hours. (*Id.*). By that time, K.R. had already been picked up by her grandmother forty-three minutes after she was dropped at the JAC. (Doc. 89-6 (Dekmar Dep.) at 104-05).

---

[20] Turner never spoke to Chief Rolon or any other watch commander on the day of K.R.'s arrest. (Doc. 89-1 at 116, 119, 123).

When Ms. Kirkland picked up K.R. she learned that K.R. had been charged with

battery and had a court date set. (Doc. 89-5 at 88-89, 91-92).

Chief Rolon was not involved in the decision to arrest K.R., nor was he present

at the scene, and he did not learn of K.R.'s arrest until others in the Department

informed him of what was happening. (Doc. 89-2 at 71). Records indicate that Chief

Rolon requested through Lt. Donohue to the state attorney's office that no charges

be filed against K.R. stemming from the incident and her record be expunged; she

never appeared in court. (Doc. 89-6 at 105-06).

*Body Worn Camera ("BWC") Video Footage*

Both Officer Turner and Officer Ramos were wearing BWC cameras, and they

activated them as they entered Ms. Stoute's office to arrest K.R. where the child was

sitting and reading a book. (Docs. 117-1, 117-2).[21]  It is undisputed (and evident on

the BWC video) that K.R. had calmed down while sitting in Ms. Stoute's office at

the time she was taken into custody when Officer Turner put the flexicuffs on her.

(Doc. 89-7 at 91-92; Docs. 117-1, 117-2).

Once Officer Ramos arrived, Officer Turner entered Ms. Stoute's office and

told K.R. it was time to go. (Doc. 117-2 at 9:33:17). Up until the time Officer Ramos

came into her office, Ms. Stoute and the other staff "didn't know [K.R.] was

---

[21]  There is no sound during the first minute on Officer Ramos's BWC video, but the sound
is turned on before the officers enter Ms. Stoute's office. (Doc. 117-2). The Court cites to the
timestamp in the upper right corner, rather than the time listed on the bottom of the video.

arrested." (Doc. 89-7 at 128). When K.R. saw the flexicuffs, she cried out that she

"did not want those on." (Doc. 117-2 at 9:33:28-9:33:36). Officer Turner cuffed

K.R.'s wrists with the flexicuffs.[22] (*Id.* at 9:33:38-9:33:52).

K.R. began to sob loudly and asked Ms. Stoute: "help me," "let me go," and

"give me a second chance," and said she "did not want to go in the police car." (Doc.

117-1 at 9:33:20-9:34:21). Officer Turner testified at his deposition that, to his

knowledge, "[p]er policy, every arrest will have restraints used behind the back,"

therefore, he had requested Officer Ramos bring flexicuffs with him for K.R.

because her arms were not big enough for regular size handcuffs, and "she could

have just pulled her hands out." (Doc. 89-1 at 79).[23]

On the BWC videos, Officers Turner and Officer Ramos walked K.R. out of

Ms. Stoute's office through another front office and an outdoor hallway to the

parking lot and up to the patrol car. Officer Ramos said in response to K.R.'s crying,

as he is leading her out to the car, "You can tell me what happened in the car, okay?"

---

[22] Although the flexicuffs are below the frame in the video, the sound of the zip-ties being sinched are audible on the video. (Doc. 117-2 at 9:33:41-9:33:51). To the extent Officer Ramos assisted in securing the flexicuffs, he was directed to bring them and use them by Officer Turner as the arresting officer. (Doc. 89-1 at 79).

[23] K.R. testified at her deposition five years later (at age 11) that the flexicuffs had cut into her wrists. (Doc. 89-4 at 45). However, the flexicuffs can be seen clearly in the video as she climbs into the car, and they were not digging into her wrists. (Doc. 117-2 at 9:34:40-9:34:50). She had no lasting injuries to her wrists and did not receive any medical treatment after being placed in the flexicuffs. (Doc. 89-5 at 96-98). Given that the analysis for excessive force is "subsumed" in the issue of false arrest, as explained *infra*, the fit of the flexicuffs is not a material issue here. At no point on the video was K.R. pushed against the trunk, as she testified at her deposition, though it is understandable why her recollection of the events at age six could be mistaken. (Doc. 89-4 at 45).

and "Put your seatbelt on, okay?" as she moved into the back seat of the patrol car with Officer Ramos having to lift her. (*Id.* at 9:34:33-9:34:52). Officer Ramos then drove her to the JAC. (Doc. 89-3 at 63-65).

After Officer Ramos pulled away, Officer Turner walked back into the School's administrative office and told Ms. Stoute, "I do need to get a statement from you, though." (Doc. 117-1 at 9:35:38; Doc. 89-7 at 111). On the video, the School administrators in the office are visibly upset at K.R.'s arrest and ask about the conditions she will face at the JAC; Officer Turner tells them that "she will be restrained":

> It's not like you think. It's just a bunch of kids in there and then by law, they -- the parents, if they haven't accumulated enough points to stay, by law, they have to be out of there in six hours. So she's going to be picked up and be at home in a couple hours. It's just, the parents have to wait for the processing, the paperwork, you know, to be handed in.

(Doc. 117-1 at 9:36:01-9:36:23; Doc. 89-7 at 111-12). Ms. Stoute was "already crying" and she "had already started to break down at that moment . . . [s]o hearing him say that . . . didn't make [her] feel better." (Doc. 89-7 at 113). Ms. Stoute's frustration with K.R.'s guardians was evident in her testimony that she "want[ed] [to] press charges [on K.R.'s] auntie and her grandma. That's what I want[ed] to do." (*Id.* at 126). She believed that K.R.'s arrest could have been avoided if her guardians had been more responsive to calls from the School that day:

> [I]f her aunt would've picked up the phone. They knew what we w[ere] calling for. It was paramount to her for them to get there and get [K.R.]

and do what they knew they needed to do . . . . [O]nce we got her situated and I was calling her people[,] they did not answer the phone. . . .[It was] challenging . . . because my kids don't hit me. My grandkids don't go to school hitting people. My children didn't go to school hitting adults. But somehow [K.R.] is allowed to do this, think it's normal, and adults have to suffer behind it. It's not right . . . even with Officer Turner, because [] all of that could have been avoided. All of it. All they had to do is pick up the telephone. They knew she was acting up because every time we called, she was acting up. And not only that . . . they brought her back the next day [after the arrest]. . . . And [s]oon as we went in the classroom, she bolted out the classroom at 8:00-something in the morning, the very next day. . . . We started calling Grandma and Auntie . . . . They didn't answer and they didn't call back.

(Doc. 89-7 at 122-23).

On the BWC video, Officer Turner can be heard telling the administrators that "the youngest I've ever arrested was 7 for stealing" and "he thought it was a joke . . . . That's the only reason he went to jail. He didn't think it was serious." (Doc. 117-1 at 9:36:54-9:37:08). In response to Officer Turner asking K.R.'s age, "she's eight, isn't she?" the administrator informed him that K.R. was only six years old, and Officer Turner responded that "now she broke the record" for the youngest person he had ever arrested out of 6,000 individuals. (*Id.* at 9:37:30-9:37:42).

*OPD Training Requirements*

During the time of the incident in 2019, after an OPD officer retired from active duty, they were permitted to take reserve status, which preserved the officer's ability to continue working off-duty jobs, and reserve officers were permitted to apply for off-duty jobs providing armed security at charter schools. (Doc. 92-4

(Gabriel Aff.) ¶ 7 ("[C]harter schools were not required to have an SRO on campus,
but were required to have armed campus security. [The School] chose Officer Turner
to fill that duty–he was not assigned by OPD."). In 2019, certain OPD officers were
employed as school resource officers and received specialized training; however,
they were not assigned to posts at Orlando-area charter schools. (*Id.* ¶¶ 3, 4; Doc.
89-3 at 12). Instead, the charter schools were permitted to hire off-duty OPD officers
to provide armed campus security, which they were required to have under Florida
Statute § 1006.12 (2019)[24]; officers who applied for those positions were hired
directly by the charter schools. (Doc. 92-4 ¶ 4).

On the day of K.R.'s arrest, September 19, 2019, Officer Turner was working
at the School, but not as a school resource officer; instead, the charter School had
hired him to serve in an "off-duty position" to provide armed campus security, and
he was not assigned to the School by OPD. (*Id.* ¶ 7). Officer Turner had not received
training as a "school resource officer" because he was not one and had "never
attempted to be." (Doc. 89-1 at 37-38, 45-46 (The jobs at the schools "were
considered off-duty jobs, like working at Publix, or at a church, or a [NBA] Magic

---

[24] Some school districts worked with law enforcement agencies to secure the services of
certified school resource officers, but schools were also permitted to hire "school safety officers"
or armed private security guards. Fla. Stat. §§ 1006.12(1)-(4) (2019).

game" since "at the time, it wasn't required to be [a school resource officer] to work in those positions.").[25]

All OPD officers—not just the school resource officers—are trained on various policies specific to juveniles–including Orlando Police Department Policy 1204.7 (Doc. 91-3), which requires in pertinent part:

2.2 GENERAL PROCESSING

If a Juvenile is arrested, the officers shall observe the following procedures:
* * *
b) Any arrest of a juvenile 11 years old or younger will require an on-duty watch commander's authorization, officers assigned as school resource officers can obtain authorization from the Youth Services Commander.

(Doc. 92-2 at 3). Officer Turner testified that he was never trained on Policy and Procedure 1204.7 because it was implemented in August 2018 after he retired on July 1, 2018. (Doc. 89-1 at 48, 121, 135). However, OPD documented in his online file that he had been presented with Policy 1204.7 and he signed electronically that he had reviewed the Policy on October 14, 2018, but he could "not say that [he] completely read all of the policies" because "[w]hen you're familiar with whatever the policy's covering, you kind of know what happened and why it's being updated,

---

[25] Plaintiff argues Turner's testimony is "patently inconsistent" with the OPD Internal Affairs Inquiry Investigation Report (at COO2637) which describes "Reserve Officer" Turner as "working as a School Resource Officer." (Doc. 112 at 2 n.2, 19 (citing 100-1 at 2)). However, the author of the Report uses the term loosely to describe Turner as working at a school. While most public schools were required to hire School Resource Officers, charter schools could hire off-duty officers as armed campus security. (Doc. 92-4 (Gabriel Aff.) ¶¶ 6-7; Doc. 90-2 at 50).

and you just click off and say yeah, I understand this." (*Id.* at 126-29). He explained that he did not "know what happened, but there's . . . a lot that I don't remember signing off on." (*Id.* at 129-30).

Chief Rolon described that all officers (not just school resource officers or those working at a school) are notified of policy updates, and when it is put out, it "is a responsibility of the officer to read and acknowledge that the changes or that the policy that they're reviewing has been reviewed thoroughly. . . . [T]here's specific language at the end of the [internal] system . . . that describes that the officer's actions is to acknowledge the fact that they fully understand the policy that they're signing off." (Doc. 89-2 at 75-76). Compliance to check that the policies are signed off is done through an audit. (*Id.* at 76).

*OPD Internal Affairs Investigation Results*

During the Internal Affairs investigation interviews of Officer Ramos, Sergeant Andreacchi, and Ms. Stoute, they offered witness statements under penalty of perjury consistent with their deposition testimony in this case; Officer Turner did not participate. (Doc. 105-1 (Unredacted Internal Affairs Investigation Report[26])).

Internal Affairs documented in its Investigative Findings that "Reserve Officer Turner never requested or attempted to contact the on-duty watch

---

[26] The Report also includes interviews related to the arrest of the second child (L.H.) by Officer Turner on the same morning of September 19, 2019.

commander nor did he obtain authorization from the School Resource Section Commander" in violation of OPD Policy and Procedure 1204.07 General Juvenile Procedures. (*Id.* at 9). The Internal Affairs investigators recommended that the allegations against Officer Turner be "sustained" for failing to obey OPD policies and procedures, specifically Policy 1204.7 regarding juvenile procedures. (*Id.*). However, Officer Ramos was "exonerated" because he "did contact his immediate supervisor multiple times expressing his concern about the arrest of a 6 year old that he was asked to transport," and "he was never given instruction not to proceed with the prisoner transportation from his supervisor Sergeant Andreacchi." (*Id.* at 10).

The allegations against Sergeant Andreacchi for failing to follow Policy 1204.7 were "sustained" because, even though he was contacted by Officer Ramos and Reserve Officer Turner regarding the arrest, he never notified Lt. Donohue or an on-duty watch commander, nor did he obtain authorization from the School Resource Section Commander, and he never gave an order to Officer Turner to not arrest the six year old. (*Id.* at 9). At the conclusion of the IA interview, Sergeant Andreacchi admitted that he "did not remember" Policy 1204.7. (*Id.*).

An internal memo from the North Patrol Division Commander (Captain Roger W. Brennan) recommended that Sergeant Andreacchi be penalized for violating Policy 1204.7 because his "decision to relegate the task of communicating the recommendation to file rather than make a physical arrest to Officer Ramos was

unacceptable" and "demonstrated a lack of sufficient engagement in his responsibilities as a supervisor and put Officer Ramos in an undesirable position of having to tell another officer what to do." (Doc. 112-1 (Memo. Cpt. Roger W. Brennan dated Dec. 16, 2019).

OPD terminated Officer Turner as a reserve officer on September 24, 2019 for failure to follow Policy and Procedure 1204.7 regarding juveniles. (Doc. 89-1 at 121, 135). Sergeant Andreacchi was penalized with an eight-hour PTO forfeiture without pay for violation of department policy. (Doc. 89-2 (Rolon Dep.) at 77).

*Following the Arrest*

K.R. continued to attend the School for a single additional day. (Doc. 89-5 at 123; Doc. 89-7 at 123; Doc. 79-1). After that, K.R. remained out of school for all of October, November, and December 2019, until Ms. Kirkland found a scholarship to help cover the private school tuition for K.R. (Doc. 89-5 at 125). Ms. Kirkland wanted to find a school that did not have an officer in uniform stationed out front because that was upsetting to K.R. following her arrest, and all of the public schools had uniformed officers stationed in front. (*Id.*).

Plaintiff alleges that "K.R.'s mental and emotional conditions have suffered" as a result of the arrest, including nightmares, intrusive thoughts, a fear of uniformed officers, and exacerbation of her fears; she is also a flight risk in large public settings. (Doc. 93-1 at 28-29, 31). K.R. was diagnosed with post-traumatic stress disorder

("PTSD") and oppositional defiant disorder ("ODD") after her arrest, although undiagnosed ADHD was preexisting, and ODD behavioral issues were preexisting according to her records. (*Id.* at 24, 27-28).[27]  She attends weekly music therapy and counseling and is on a medication management plan to address ADHD, PTSD, and ODD. (*Id.*).

### C. Claims at Issue

Plaintiff brings excessive force, false arrest, and malicious prosecution claims against the arresting officer, Officer Turner, and the transporting officer, Officer Ramos. (Counts I, II, III). Plaintiff also alleges supervisory liability[28] against Officer Ramos's supervisor, Sergeant Andreacchi, and OPD Chief Orlando Rolon (Count IV). Plaintiff brings a *Monell* claim for municipal liability (Count V), alleging that the City had a "custom of ignoring departmental policies designed to protect children from unconstitutional arrests" which "was the moving force behind Defendant Turner's actions" in "ignoring City policies and procedures in dealing with juveniles." (Doc. 112 at 1-2). Plaintiff also argues that the City had a custom or

---

[27] A month before the incident, a mental health professional diagnosed K.R. with adjustment disorder with mixed disturbance of emotion and conduct. (Doc. 93-1 at 59). Dr. Day opined that the condition was identified prior to the incident and "graduated to ODD" after the incident. (*Id.* at 59-60, 62).

[28] Defendants contend that it is not clear in the Second Amended Complaint that Plaintiff alleges a § 1983 claim for supervisory liability because the allegations incorporate by reference all previous counts which are brought under § 1983. (Doc. 92 at 13 n.5). Plaintiff fails to address the claim against Chief Rolon in her Response but argues claims against Sergeant Andreacchi under § 1983, which the Court addresses *infra*.
.

policy of officers making "inadequate, unjustified, and unreasonable arrests of
juveniles by OPD officers." (*Id.*).

## II.   LEGAL STANDARD

A court should grant a motion for summary judgment "if the movant shows
that there is no genuine dispute as to any material fact and the movant is entitled to
judgment as a matter of law." Fed. R. Civ. P. 56(a). A dispute of material fact exists
"if the evidence is such that a reasonable jury could return a verdict for the
nonmoving party." *Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 248 (1986). Once
the moving party meets this burden, "[t]he burden then shifts to the non-moving
party, who must go beyond the pleadings and present affirmative evidence to show
that a genuine issue of material fact exists." *Porter v. Ray*, 461 F.3d 1315, 1320 (11th
Cir. 2006) (citing *Fitzpatrick v. City of Atlanta*, 2 F.3d 1112, 1115–17 (11th Cir.
1993)).

Federal courts cannot weigh credibility at the summary judgment stage. *See
Feliciano v. City of Miami Beach*, 707 F.3d 1244, 1252 (11th Cir. 2013) ("Even if a
district court believes that the evidence presented by one side is of doubtful veracity,
it is not proper to grant summary judgment on the basis of credibility choices."
(citation omitted)). Therefore, the Court will "make no credibility determinations or
choose between conflicting testimony, but instead [will] accept [the non-moving
party's] version of the facts drawing all justifiable inferences in [the non-movant's]

favor." *Burnette v. Taylor*, 533 F.3d 1325, 1330 (11th Cir. 2008). Notwithstanding this inference, "[t]here is [still] no genuine issue for trial unless the non-moving party establishes, through the record presented to the court, that it is able to prove evidence sufficient for a jury to return a verdict in its favor." *Cohen v. United Bank of Cent. Fla.*, 83 F.3d 1347, 1349 (11th Cir. 1996).

In determining if Defendants are entitled to summary judgment based on qualified immunity, the Court is to "resolve all issues of material fact in favor of the plaintiff." *Oliver v. Fiorino*, 586 F.3d 898, 901 (11th Cir. 2009). However, "[a] court need not permit a case to go to a jury . . . when the inferences that are drawn from the evidence, and upon which the non-movant relies, are 'implausible.'" *Mize v. Jefferson City Bd. of Educ.*, 93 F.3d 739, 743 (11th Cir. 1996). "[W]hen a video recording exists of the pertinent events—as in this case—we 'view the facts in the light depicted by the videotape.'" *Jones v. Michael*, 656 F. App'x 923, 926 (11th Cir. 2016) (quoting *Scott v. Harris*, 550 U.S. 372, 381 (2007)). Where the video is inconclusive, undisputed testimony can fill in the gaps. *Pourmoghani-Esfahani v. Gee*, 625 F.3d 1313, 1315 (11th Cir. 2010).

## III. ANALYSIS

### 1. Section 1983 and Qualified Immunity

To state a cause of action under 42 U.S.C. § 1983, a plaintiff must allege that (1) the defendant deprived her of rights protected by the Constitution or a federal

statute and (2) acted under color of state law. *Gomez v. Toledo*, 446 U.S. 635, 640

(1980); *Myers v. Bowman*, 713 F.3d 1319, 1329 (11th Cir. 2013). "The qualified

immunity defense shields 'government officials performing discretionary functions

from liability for civil damages insofar as their conduct does not violate clearly

established statutory or constitutional rights of which a reasonable person would

have known.'" *Corbitt v. Vickers*, 929 F.3d 1304, 1311 (11th Cir. 2019) (omission

adopted) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)). The protection

of qualified immunity is afforded "to all but the plainly incompetent and those who

knowingly violate the law." *Malley v. Briggs*, 475 U.S. 335, 341 (1986).

"To receive qualified immunity, [a] public official 'must first prove that he

was acting within the scope of his discretionary authority when the allegedly

wrongful acts occurred.'" *Vinyard v. Wilson*, 311 F.3d 1340, 1346 (11th Cir. 2002)

(quoting *Lee v. Ferraro*, 284 F.3d 1188, 1194 (11th Cir. 2002)). "Because making

an arrest is within the official responsibilities" of a law enforcement officer, the

officers were "performing a discretionary function" in "policing the behavior of

students" and arresting a student in this case. *See Crosby v. Monroe Cty.*, 394 F.3d

1328, 1332 (11th Cir. 2004) (making an arrest is within the official responsibilities

of a law enforcement officer who was performing a discretionary function); *cf.*

*Ziegler v. Martin Cnty. Sch. Dist.*, 831 F.3d 1309, 1316 n.3 (11th Cir. 2016) (deputy

sheriff working as school resource officer who searched party bus was exercising

discretionary authority).

Once the defendant establishes that he was acting within his discretionary authority, the burden shifts to the plaintiff to show that qualified immunity is not appropriate." *Lee*, 284 F.3d at 1194. "To overcome a qualified immunity defense, the plaintiff must make two showings." *Corbitt,* 929 F.3d at 1311. The plaintiff must show "that the defendant violated a constitutional right." *Griffin Indus., Inc. v. Irvin*, 496 F.3d 1189, 1199 (11th Cir. 2007). The plaintiff must also "show that the violation was clearly established." *Id.* For the second inquiry, the key question "is whether the state of the law gave the defendants 'fair warning' that their alleged conduct was unconstitutional." *Vaughan v. Cox*, 343 F.3d 1323, 1332 (11th Cir. 2003) (quoting *Hope v. Pelzer*, 536 U.S. 730, 741 (2002)); *see Anderson v. Creighton*, 483 U.S. 635, 640 (1987) ("The contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right.").

"A right may be clearly established for qualified immunity purposes in one of three ways: (1) case law with indistinguishable facts clearly establishing the constitutional right; (2) a broad statement of principle within the Constitution, statute, or case law that clearly establishes a constitutional right; or (3) conduct so egregious that a constitutional right was clearly violated, even in the total absence of case law." *Gilmore v. Ga. Dep't of Corrections*, No. 23-10343, _ F.4th _, 2025

WL 1911728 (11th Cir. July 11, 2025) (quotation omitted). "Under the third method,

'a general constitutional rule . . . may apply with obvious clarity to the specific

conduct in question, even though the very action in question has not previously been

held unlawful.'" *Id.* at *8 (quoting *Hope*, 536 U.S. at 741).

The court can determine whether a right is "clearly established" by "looking

to the law as interpreted at the time by the United States Supreme Court, the Eleventh

Circuit, or the Florida Supreme Court." *Terrell v. Smith*, 668 F.3d 1244, 1255 (11th

Cir. 2012). In addition, "reliance on out-of-circuit authorities is permitted in

determining whether a violation was of 'obvious clarity'" for purposes of qualified

immunity. *Gilmore,* 2025 WL 1911728 at *11 (considering persuasive cases from

seven other circuits that had confronted the same issue as a "relevant and important

consideration in the 'obvious clarity' analysis"). Courts may analyze the two distinct

components of plaintiffs' burden in either order at their discretion. *See Pearson v.

Callahan*, 555 U.S. 223, 236 (2009).

Assisting officers are "entitled to qualified immunity when there is no

indication that they acted unreasonably in following the lead of a primary officer or

that they knew or should have known that their conduct might result in a

[constitutional] violation, even when the primary officer is not entitled to qualified

immunity." *Shepard v. Hallandale Beach Police Dep't*, 398 Fed. App'x 480, 483

(11th Cir. 2010) (citation omitted) (finding that defendant officers who accompanied

a deputy performing an unauthorized search were entitled to qualified immunity
because the record lacked evidence supporting the conclusion that assisting officers
acted unreasonably or had reason to suspect that the plaintiff's rights were being
violated).

### 2. Malicious Prosecution Claim (Count III)

Officer Turner and Officer Ramos move for summary judgment on Plaintiff's
§1983 malicious prosecution claim arguing that Officer Turner had probable cause
for K.R.'s arrest. The Court need not reach that issue because Plaintiff cannot assert
a malicious prosecution claim against the individual officers arising out of the
warrantless arrest in this case. In order to establish a federal malicious prosecution
claim under § 1983, a plaintiff must prove "(1) the elements of the common law tort
of malicious prosecution, and (2) a violation of [the arrestee's] Fourth Amendment
right to be free of unreasonable seizures." *Paez v. Mulvey*, 915 F.3d 1276, 1285 (11th
Cir. 2019) (quotation omitted). Both parties correctly cite the elements of malicious
prosecution under Florida law:

> (1) an original judicial proceeding against the present plaintiff was
> commenced or continued; (2) the present defendant was the legal cause
> of the original proceeding; (3) the termination of the original
> proceeding constituted a bona fide termination of that proceeding in
> favor of the present plaintiff; (4) there was an absence of probable cause
> for the original proceeding; (5) there was malice on the part of the
> present defendant; and (6) the plaintiff suffered damages as a result of
> the original proceeding.

*Id.* at 1291 (quoting *Durkin v. Davis*, 814 So.2d 1246, 1248 (Fla. 2d DCA 2002)).

However, caselaw in the Eleventh Circuit is clear that a warrantless arrest and charge, standing alone, "cannot serve as the predicate deprivation of liberty" in a malicious prosecution claim. *Donley v. City of Morrow, Ga.*, 601 F. App'x 805, 813 (11th Cir. 2015) (per curiam) (quoting *Kingsland v. City of Miami*, 382 F.3d 1220, 1235 (11th Cir. 2004), *abrogated on other grounds by Williams v. Aguirre*, 965 F.3d 1147, 1159-62 (11th Cir. 2020)). "[W]hen there is a warrantless arrest, 'the judicial proceeding does not begin until the party is arraigned or indicted.'" *Id.* (holding that the plaintiff's warrantless arrest could not "serve as the predicate Fourth Amendment seizure for purposes of his § 1983 malicious prosecution claim," as opposed to a false arrest claim, which he had failed to properly allege); *Douglas v. Judd*, No. 8:24-cv-2569-VMC-AAS, 2025 WL 807466, at *3 (M.D. Fla. Mar. 13, 2025) (dismissing malicious prosecution claim where complaint referenced only a warrantless arrest and charges, but the tort of malicious prosecution required a seizure "pursuant to legal process"); *Cottam v. Pelton*, No. 5:16-cv-413-OC-30PRL, 2017 WL 8751732, at *7 (M.D. Fla. Dec. 8, 2017) (holding arrestee had not alleged a malicious prosecution claim where he spent a few hours in jail but was not arraigned or indicted, and charges against him were dismissed before he ever saw a judge), *aff'd sub nom. Cottam v. City of Wildwood*, 750 F. App'x 791 (11th Cir. 2018).

"[W]arrant-based seizures" and "seizures following an arraignment, indictment, or probable-cause hearing" suffice for a malicious prosecution claim

because seizures "pursuant to legal process" violate the Fourth Amendment when the "legal process itself goes wrong—when, for example, a judge's probable-cause determination is predicated solely on a police officer's false statements." *Williams*, 965 F.3d at 1158 (quoting *Manuel v. City of Joliet*, 580 U.S. 357, 367 (2017)); *see also Sylvester v. Fulton Cnty. Jail*, 94 F.4th 1324, 1330 (11th Cir. 2024) ("A [§ 1983] 'malicious prosecution' claim is that an officer used a constitutionally deficient legal process to effectuate an arrest—here, an allegedly defective warrant.").

Based on the record in this case, K.R. was arrested without a warrant, and Plaintiff has proffered no evidence that the warrantless arrest of K.R. subsequently involved an arraignment or indictment. *See Williams*, 965 F.3d at 1159-62 ("A claim of false arrest or imprisonment under the Fourth Amendment concerns seizures without legal process, such as warrantless arrests. . . . Malicious prosecution, in contrast, requires a seizure 'pursuant to legal process' [and] warrant-based seizures fall within this category."). Because K.R.'s arrest was warrantless and did not otherwise involve "legal process" such as a warrant, an arraignment, or an indictment, the individual Officers, Turner and Ramos, are entitled to summary judgment on Plaintiff's claims for malicious prosecution.

### 3. § 1983 False Arrest and Excessive Force Claims (Counts I and II)

Officer Turner argues that he is entitled to summary judgment on qualified immunity in defense of Plaintiff's Fourth Amendment claims for false arrest and

excessive force. (Doc. 89). He argues that he is entitled to qualified immunity
because he had probable cause to arrest K.R. for misdemeanor battery, and there was
a lack of "clearly established law" that "arresting a compliant elementary school-
aged child" for "misdemeanor battery violated the Fourth Amendment as long as the
officer has probable cause." (Doc. 89 at 13).

The Fourth Amendment provides a "right of the people to be secure in their
persons . . . against unreasonable . . . seizures." U.S. Const. amend. IV. "A
warrantless arrest without probable cause violates the Constitution and provides a
basis for a section 1983 claim[,]" but "[t]he existence of probable cause at the time
of arrest . . . constitutes an absolute bar to a section 1983 action for false arrest."
*Case v. Eslinger*, 555 F.3d 1317, 1326-27 (11th Cir. 2009). In the context of § 1983
false arrest claims, "an officer need not have actual probable cause, but only
'arguable' probable cause" to be entitled to qualified immunity. *Garcia v. Casey*, 75
F.4th 1176, 1186 (11th Cir. 2023) (citation omitted). "Probable cause to arrest exists
when law enforcement officials have facts and circumstances within their knowledge
sufficient to warrant a reasonable belief that the suspect had committed or was
committing a crime." *Skop v. City of Atlanta, Ga.,* 485 F.3d 1130, 1137 (11th Cir.
2007). While "[a]n arresting officer is required to conduct a reasonable investigation
to establish probable cause," the officer need only put forth "reasonably trustworthy
information" on which he relied. *Id.* "[P]robable cause requires only a probability or

substantial chance of criminal activity, not an actual showing of such activity." *Case*, 555 F.3d at 1327.

Officer Turner quotes the appropriate standard for "arguable probable cause" in a § 1983 false arrest case, which "exists where reasonable officers in the same circumstances and possessing the same knowledge as the Defendants could have believed that probable cause existed to arrest Plaintiff." (Doc. 89 at 13 (citing *Brown v. City of Huntsville, Ala.*, 608 F.3d 724, 734 (11th Cir. 2010) (quotation omitted)). "Indeed, it is inevitable that law enforcement officials will in some cases reasonably but mistakenly conclude that probable cause is present, and in such cases those officials should not be held personally liable." (*Id.* at 13-14 (citing *Brown*, 608 F.3d at 734-35 (quotation omitted)). The "standard is an objective one and does not include an inquiry into the officer's subjective intent or beliefs." (*Id.* at 14 (citing *Brown*, 608 F.3d at 734-35)).[29]

The Fourth Amendment also "encompasses the plain right to be free from the use of excessive force." *Lee,* 284 F.3d at 1197. Officer Turner cites well-settled Supreme Court precedent that holds a law-enforcement officer's "right to make an arrest . . . necessarily carries with it the right to use some degree of physical coercion

---

[29] Although Officer Turner and the City argue Plaintiff's expert (Mr. Dekmar) testified that actual probable cause existed that K.R. committed the offense of battery, it is up to the Court to decide whether probable cause existed in this case involving the arrest of a six year old based on the factors discussed at length in the text.

. . . to effect it." *Graham v. Connor*, 490 U.S. 386, 396 (1989). "All claims that law enforcement officers have used excessive force . . . in the course of an arrest . . . should be analyzed under the Fourth Amendment and its 'reasonableness' standard." *Graham*, 490 U.S. at 395-96. "That standard requires us to ask 'whether the officer's conduct was objectively reasonable in light of the facts confronting the officer.'" *Patel v. City of Madison*, 959 F.3d 1330, 1338–39 (11th Cir. 2020) (alterations adopted) (quoting *Vinyard v. Wilson*, 311 F.3d 1340, 1347 (11th Cir. 2002)).

"[T]he Court must "examine the totality of the circumstances, 'including the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether the suspect is actively resisting arrest or attempting to evade arrest by flight.'" *Baker v. City of Madison*, 67 F.4th 1268, 1279 (11th Cir. 2023) (alterations adopted) (quoting *Graham*, 490 U.S. at 396). Because the Fourth Amendment does not protect against the use of "reasonably necessary force" by law enforcement, the Court must also consider "the need for the application of force, . . . the relationship between the need and the amount of force used, and . . . the extent of the injury inflicted." *Mobley v. Palm Beach Cnty. Sheriff Dep't*, 783 F.3d 1347, 1353 (11th Cir. 2015).

Officer Turner contends that "[t]he only conceivable use of force here is the use of flexicuffs," and courts have "repeatedly recognized that when making a custodial arrest, some use of force is necessary and altogether lawful" such that

"painful handcuffing alone doesn't constitute excessive force." (Doc. 89 at 17 (citing

*Huebner v. Bradshaw*, 935 F.3d 1183, 1191 (11th Cir. 2019)).

Officer Turner correctly notes that the Eleventh Circuit has "declined to
entertain claims of excessive force predicated upon the use" of *de minimis* force by
law enforcement during the arrests of adults. *Croom v. Balkwill*, 645 F.3d 1240, 1252
(11th Cir. 2011); *Nolin v. Isbell*, 207 F.3d 1253, 1257-58 (11th Cir. 2000) (noting *de
minimis* force may result in bruising from throwing a suspect against a van, kicking
his legs apart, making him raise his arms where the injury inflicted was "minor in
nature"). Notably, however, Officer Turner recognizes that general statements about
*de minimis* force pertaining to the arrest of an adult are less applicable to the arrest
of a six-year-old, yet he argues that "there is nothing categorically unconstitutional
about the arrest of a child under ten." (Doc. 89 at 17).

The Court now turns to application of the law for § 1983 claims of false arrest
and excessive force in the arrest of a six-year-old for misdemeanor battery of an
administrator at an elementary school.

### a. False Arrest Claim Against Officer Turner

In support of Officer Turner's argument that he is entitled to qualified
immunity on Plaintiff's false arrest claim, he argues that he had probable cause, or
at least arguable probable cause, based on Ms. Stoute's statement that K.R. punched
and kicked her—although she admitted "it didn't hurt"—while she restrained K.R.

from running off. Officer Turner cites cases holding that an officer may generally rely on information provided by a victim who is a witness to support probable cause. (Doc. 89 at 14 (citing *Fleuranville v. Miami-Dade Cty.*, No. 1:23-cv-21797-KMM, 2023 WL 8268763, *3 (S.D. Fla. Nov. 28, 2023) ("It is well established that police officers may generally rely on eyewitness accounts and victim statements to establish probable cause.")); *see also United States v. Gonzalez*, 107 F.4th 1304, 1311 (11th Cir. 2024) (holding the Fourth Amendment permits a warrantless arrest for a misdemeanor offense even if the offense was not committed in the arresting officer's presence); Fla. Stat. § 901.15(9)(a) (2019) (permitting a warrantless arrest for misdemeanor battery upon probable cause even when the offense was not committed in the officer's presence). Officer Turner argues that if this case involved an adult's arrest, there would not be "even a whisper of unconstitutionality" in the arrest and handcuffing and "[p]ut another way, if K.R. were an adult and all other facts were the same, § 1983 action would be downright frivolous." (Doc. 89 at 17-18). In Officer Turner's opinion, "Plaintiff must therefore proffer some binding decision that transforms a patently constitutional arrest into an unconstitutional one purely due to K.R.'s age." *Id.*

Plaintiff responds that it was "not objectively reasonable under the circumstances to arrest a six-year-old girl [] experiencing a tantrum at school" due "to an underlying medical condition" and "after she had de-escalated for 15-20

minutes . . . where there [was] no intent to commit any criminal act." (Doc. 111 at

13). Plaintiff also argues that, regardless of whether the Court finds arguable

probable cause for the arrest of K.R., Officer Turner "used excessive force in

arresting K.R." by handcuffing her essentially just to discipline her for misbehavior

because she would not listen to his instructions to "calm down." (Doc. 111 at 17

(citing *Gray ex rel. Alexander v. Bostic,* 458 F.3d 1295, 1304 (11th Cir. 2006)).

Plaintiff concedes the "general rule that police officers may rely on eyewitness

accounts and victim statements to establish probable cause," but, in this case, she

argues, "the application of that rule to the facts of this case is nuanced" and should

not be "misapplied." (Doc. 111 at 11). Plaintiff contends it is "undisputed" based on

Ms. Stoute's testimony that "there was no victim and no victim statement to

truthfully assess probable cause to arrest K.R." (*Id.*). First, she argues that Officer

Turner lacked probable cause and initiated the arrest of K.R. before he had even

obtained Ms. Stoute's witness statement, since Officer Turner is clearly heard on the

BWC video—after K.R. has been arrested and driven away—telling Ms. Stoute, "I

need you to give me a statement, though." (Doc. 111 at 11 (citing Doc. 117-1)).

Second, she argues that Officer Turner did not have at least arguable probable cause

because he "lied" and "invented facts" contained in his Arrest Affidavit when he

"assert[ed] Ms. Stoute told him she wanted to press charges." (*Id.*).

It is true that Ms. Stoute denied she wanted to press charges when she was interviewed (under penalty of perjury) by Internal Affairs investigators a week after the arrest (on September 26, 2019) explaining: "I did not verbally say '[H]ey Officer Turner I want to charge this little person with battery. No, I did not." (Doc. 111-4 (Stoute IA Statement Tr.)). Ms. Stoute also did not sign her initials on the section on the Witness Statement she gave to Officer Turner that said "I will testify in court and prosecute criminally," but neither did she sign the section that said she was "refusing to prosecute."

Nonetheless, Officer Turner testified that, in his view, "when you sign th[e] box" that says "I swear or affirm the above and/or attached statements are correct and true" on the form, he understands that to "mean[] you're going to press charges" because further down in the bottom left on the same form "there's a declination to prosecute"[30] and "[i]f they sign that [declination box] that means they do not want to press charges." (*Id.* at 67-68). On the form that Ms. Stoute completed, the declination box was marked "N/A." (Doc. 106-1). Officer Turner testified:

> Q. So instead of saying you want to press charges there is an active refusal?
>
> A. Right. That's a declination to prosecute.
>
> Q. Okay. And it's your testimony that that means that [Ms. Stoute] was affirmatively stating she wants to prosecute?

---

[30] "My signature below means that I refuse to prosecute the person(s) named above for the alleged crime(s) that occurred to me or to the property under my control." (Doc. 106-1).

> A. I would not have allowed her to put pen to paper if she didn't tell me
> she wanted to press charges because it—the other reason I would let her
> write a statement that charges were going to be filed. But other than
> that, if nothing is going to happen, no statements are taken. These are
> sworn written statements.

(*Id.* at 68).

Officer Turner concedes that he did not see K.R. kicking and punching Ms.
Stoute or the other School staff (Doc. 89-1 at 63), although he did observe the
principal restraining K.R. in the inner office, close to his station. Thus, he argues,
there was sufficient probable cause based on Ms. Stoute's oral report to believe K.R.
had committed a battery under Florida law. (Doc. 89 at 15 (citing *Huebner*, 935 F.3d
at 1188) ("any unwanted 'touch' will suffice")). Defendants also cite a Florida
statute defining a battery as occurring when a person "[a]ctually and intentionally
touches or strikes another person against the will of the other" or "[i]ntentionally
causes bodily harm to another person." Fla. Stat. §784.03(1)(a). They also argue that
"[a] substantial certainty of touching or striking satisfies the intent element of
battery." *Rosa v. City of Ft. Myers*, 297 Fed. Appx. 830, 834 (11th Cir. 2008)
(citation omitted).

It is undisputed that Ms. Stoute did not prepare a written statement until after
Officer Turner had decided to arrest K.R. Although Ms. Stoute did explain
"verbally" to Officer Turner what had happened before K.R.'s arrest, she confirmed
that K.R.'s punches—like those from most 50-pound six year olds—"didn't hurt."

(Doc. 89-7 at 81, 126). She understood that she would have to testify against K.R. if the case went to court,[31] but she "did not press charges on her." (*Id.* at 108, 124, 126). She acknowledged that "it was a challenging time for everybody" and "we cried when [K.R.] was going" to the JAC in flexicuffs:

> [W]e felt bad. Like, who wants that to happen? I didn't press charges on her. Maybe I should have because she was hitting me and no one wants to address that issue. *But nobody in that [School] office wanted that.* We were dealing with it in the way we knew how to deal with it. . . . It could have been avoided if . . . her aunt would've picked up the phone. . . . [O]nce we got her situated and I was calling her people [t]hey did not answer the phone. [W]e were doing all we could do.

(Doc. 89-7 at 108, 122 (emphasis added)).

Although Defendants argue that there is "no requirement that the victim consent to an arrest" where probable cause exists, based on the case of *Rosa v. City of Fort Myers, Fla.*, 297 Fed. Appx. 830, 835 (11th Cir. 2008), they erroneously cite the wrong Florida Statute being discussed for that principle in the case, Florida Statute § 741.29(3), which only applies to domestic violence prosecutions. Their other citation is to a case that stands for the general statement that "an arrest is lawful under the Fourth Amendment if there is probable cause" and does not add support to their argument. (*Id.* (citing *Jordan v. Mosley*, 487 F.3d 1350, 1355 (11th Cir. 2007)).

---

[31] When Ms. Stoute signed the witness statement, she testified that Turner asked her, "if it goes to court, would she testify?" and she told him, "Yes." (Doc. 89-7 at 120).

The distinguishing factor in K.R.'s case is the one Plaintiff identifies—the probable cause cases cited by Defendants apply to the arrests of adults. She cites as recognition that cases involving six-year-olds should be treated differently the "national outcry" following K.R.'s arrest that led to "[t]he Florida Legislature . . . enacting Florida Statute § 985.031, prohibiting the arrest of minors under the age of seven except for certain 'forcible felonies.'"[32] (Doc. 111 at 2). Plaintiff argues that Officer Turner's "low bar" definition of battery—what she describes as simply "*any* unwanted touching*"—misstates the law and ignores the intent element of the main case he cites, *Huebner v. Bradshaw*, 935 F.3d 1183, 1188 (11th Cir. 2019), particularly with regard to young children for whom Plaintiff argues "it would create an unworkable rule of law" without any intent requirement. (Doc. 111 at 12).

Plaintiff points to K.R.'s testimony that, as a six-year-old first grade student, she never "purposely" intended to strike "anyone" during her "tantrum," and it should not be labeled a battery because K.R. lacked the intent to "commit any criminal act." (*Id.*). Plaintiff argues that the *Huebner* case cited by Officer Turner is easily distinguished because it involved adults punching and hair pulling, which

---

[32] Section 985.031 reads:
Age limitation; exception
(1) This section may be cited as the "[K.R.] Act."
(2) A child younger than 7 years of age may not be arrested, charged, or adjudicated delinquent for a delinquent act or violation of law based on an act occurring before he or she reaches 7 years of age, unless the violation of law is a forcible felony as defined in s. 776.08.
Fla. Stat. § 985.031 (eff. July 1, 2021).

necessarily involved "*intentional* unwanted touching," and should not justify the arrest of a child "simply having a tantrum." (*Id.*).

As Plaintiff argues, and Officer Turner essentially recognizes (Doc. 89 at 18), the arrest of a young child is analyzed differently from the arrest of an adult.[33] The Court does not disagree with Officer Turner that an arrest for misdemeanor battery based on a witness statement theoretically would support arguable probable cause in the case of an adult.

However, in K.R.'s case, the heart of the issue is the longstanding recognition—dating back at least two centuries to Blackstone's Commentaries—that a six-year-old child generally lacks the *mens rea* to commit a crime required to convict an adult:

> Prior to the creation of juvenile courts, there was little to no distinction between children and adults in the criminal system. Children were processed in the same criminal courts as adults. Children faced the same punishments and were incarcerated in the same jails. Because there was no child-specific system for children who committed criminal acts, *the common law rule was that children under seven could not be guilty of a felony* or punished for any capital offense. *Essentially, children under the age of seven were seen as "infants" who did not have a "vicious will" to commit crime and therefore would not be held responsible in the same way as adults*.
> * * *
> Dating back to the common law, there has been some agreement that court intervention is not typically appropriate for young children. Even

---

[33] Even so, Turner argues in Reply that the Court should not focus on K.R.'s "state of mind" and lack of criminal intent in assessing probable cause because that "implicitly asks for proof nearing guilt beyond a reasonable doubt." (Doc. 119 at 2). The Court rejects this argument in the unique context of the arrest of a six-year-old child.

> once the juvenile court was established under the guise of offering
> developmentally appropriate services to children, legal mechanisms
> developed to provide different treatment or consideration in the cases
> of young children. For example, some states allow a juvenile defendant
> in delinquency court to raise an infancy defense asserting that the
> juvenile defendant should not be subject to criminal prosecution
> because they are too young or immature to form criminal intent.

Peggy Nicholson, *Too Young to Suspend: Ending Early Grade School Exclusion by Applying Lessons from the Fight to Increase the Minimum Age of Juvenile Court Jurisdiction,* 11 Belmont L. Rev. at 338-39 (Spring 2024) (citing 4 William Blackstone, Commentaries (J.W. Jones trans., Lonang Inst. 2005) (1823)); *id*. at 353 (emphasis added; citations omitted). At least one commentator has also noted that there has been an unfortunate "increase in warrantless arrests of children at schools over the past decade and many of these arrests are for nonviolent offenses." Ramon A. Soto, *Arrested for a Belch in Gym Class: A.M. v. Holmes, Excessive Force on Schoolchildren, and Qualified Immunity*, 54 No. 1 Crim. Law Bulletin (Winter 2018).[34] Here, Plaintiff argues that there was a lack of arguable probable cause to arrest K.R. for having a tantrum or trying to run away from administrators, especially after K.R. had de-escalated and was sitting in the administrator's office reading a book for at least 15-20 minutes.

---

[34] The author quotes the scathing criticism in the dissent by then-Tenth Circuit Judge (now Supreme Court Justice) Neil Gorsuch of the majority's 94-page opinion affirming qualified immunity for the school resource officer who arrested a seventh grader for "fake burping in gym class." *Id.* (discussing *A.M. v. Holmes*, 830 F.3d 1123, 1169 (10th Cir. 2016)).

The Court finds based on the evidence in the record that a reasonable officer would not have believed that arresting a six-year-old with unresolved medical/behavioral issues for misdemeanor battery was supported by probable cause. It is clear from Ms. Stoute's testimony and the School administrators' contacts with K.R.'s family that the administrators had grown (understandably) frustrated with the lack of medical/behavioral treatment information from healthcare providers to address K.R.'s behavior, despite multiple school suspensions and discussions about her behavior communicated to her family members. Based on the record before the Court, the administrators' request to Officer Turner for his "help" was directed at controlling K.R.'s behavior and disruptions at school and improving the situation to obtain better engagement from the guardians on the issue—which Officer Turner and administrators had tried to accomplish by calling K.R.'s relatives unsuccessfully—and it was not a request that Officer Turner protect the administrators' physical safety from the six year old's physical contact by "pressing charges" or arresting her.

By the time Officer Turner witnessed the situation in the front office, an administrator was holding K.R. by her forearms and had her under control, restraining her from eloping from the room. The Court is not minimizing the disruptiveness of this on-going behavior for School staff, but the fact that Officer Turner did not believe he needed to intervene in the physical aspect of controlling

K.R. because, in his own words, it was a "procedural thing that [the principal] had to deal with" because the "little girl . . . wasn't committing any crimes," reflects his initial view that K.R.'s actions were misbehaviors to be handled by School staff— and not criminal actions warranting police intervention. *See A.M. v. Holmes*, 830 F.3d 1123, at 1169-70 (10th Cir. 2016) (Gorsuch, J., dissenting) (noting that "disciplining children who temporarily distract classmates and interrupt lessons is simply part of [traditional] school activity" and its "mission," and "cases draw a distinction" between "childish pranks" and the more "seriously disruptive behaviors" that are prohibited by statute).

Officer Turner was not asked—or expected by School staff—to intervene physically to prevent injury to them by K.R. As Officer Turner told School staff regarding *both* children he arrested on September 19, essentially that the parents "would pick them up at the JAC" where "it was just a bunch of kids" and the children should "be at home in a couple hours." He viewed the arrest as a way "just to get help from" the guardians to address the students' misbehavior, especially since in K.R.'s case, School staff believed that her guardians were choosing not to answer phone calls from School administrators or Officer Turner even though they allegedly knew of K.R.'s "out of control" behavior.

Based on the evidence in the record which must be read in favor of Plaintiff, the non-movant, Officer Turner's arrest of six year old K.R. was without "arguable

probable cause" because it was undertaken to punish her and demonstrate the "seriousness" of her misbehavior to her family members, in violation of K.R.'s constitutional rights under the Fourth Amendment. Every reasonable officer would have known that arresting a compliant six year old child to punish her or demonstrate the seriousness of her misbehavior to her family members is unreasonable.

The Court turns to whether Officer Ramos violated K.R.'s constitutional rights by transporting her to the JAC at the direction of Officer Turner before addressing whether the law on seizure and handcuffing a six year old for punitive reasons was "clearly established."

### b. Liability of Assisting Officer Ramos

Officer Ramos argues that as an "assisting officer," there is a high bar for Plaintiff to overcome qualified immunity. He argues that he is "entitled to qualified immunity when there is no indication that [he] acted unreasonably in following the lead of a primary officer or that [he] knew or should have known that [his] conduct might result in a [constitutional] violation, even when the primary officer is not entitled to qualified immunity." (Doc. 90 at 13 (quoting *Smith v. Confreda*, No. 6:14-cv-1704-Orl-37TBS, 2016 WL 3344481 (M.D. Fla. June 15, 2016) and others). He argues that Officer Turner had already made the decision to arrest K.R. before he got on the radio asking for a transport officer. Once involved, Officer Ramos suggested to Officer Turner other less serious options than an immediate arrest,

including not arresting K.R. at all, and conveyed his concerns to his supervisor, Sergeant Andreacchi, who also discussed those other options with Officer Turner. Nevertheless, Officer Turner ultimately decided to exercise his discretion to effectuate a physical arrest.

Plaintiff argues that Officer Ramos is not entitled to qualified immunity and bears responsibility with Officer Turner for the unlawful arrest of K.R. because he "knew that the arrest of K.R. was wrong—in every respect—and he articulated his concern that he and Defendant Turner were arresting a child that—as Officer Ramos described her—"looked like a baby." (Doc. 113 at 11). She argues that assisting officers are not entitled to qualified immunity where there is an "indication that they acted unreasonably in following the lead of a primary officer" and "they knew or should have known that their conduct might result in a [constitutional] violation." (*Id.* at 11 (quoting *Shepard v. Hallandale Beach Police Dep't*, 398 F. App'x 480, 483 (11th Cir. 2010)). Plaintiff contends that Officer Ramos "had reason to know K.R.'s constitutional rights were being violated," which was why he sought help from his supervisor and later testified that he "felt like, 'Man, this is just so – it feels weird. It feels wrong.'" (Doc. 113 at 13-14 (citing Doc. 89-3 at 83)).

Officer Ramos argues in Reply that, according to Officer Turner's statements to him, K.R. was reportedly "out of control," had to be "restrained" by staff, and Turner had probable cause because the School staff were "insisting" on "pressing

charges and [K.R.] had battered someone." (Doc. 89-3 at 59-62). According to Officer Ramos, these factors were sufficient probable cause to arrest K.R., even if he would not have made the same decision—he could take Officer Turner's word for it because "battery is a non-view misdemeanor" and he did not have to have personally observed the battery, but could rely on Officer Turner's statements in the charging affidavit. (*Id.* at 62).

Based on the evidence in the record, including the transcripts of the interviews from the Internal Affairs investigation, the Court finds that there is no indication that Officer Ramos "acted unreasonably" in transporting K.R. based on Officer Turner's representations, including in the charging affidavit, that he had probable cause to arrest K.R. for misdemeanor battery because she had battered "three staff members by kicking and punching them without permission" and they were "insisting" on "pressing charges." *See Hartsfield v. Lemacks*, 50 F.3d 950, 954 (11th Cir. 1995) (concluding that officers who had not seen the search warrant and followed the investigating officer, who had obtained search warrant, into the wrong house were entitled to qualified immunity). Because Plaintiff has failed to show that Officer Ramos violated K.R.'s constitutional rights, Officer Ramos is entitled to qualified immunity, and summary judgment on this defense will be granted in his favor.

### c. Excessive Force Claim Is "Subsumed" In False Arrest Claim

Turning to Plaintiff's excessive-force claim, she argues that "courts look to

whether an officer's conduct in making an arrest is objectively reasonable or if it is an over-reactive, disproportionate action for the situation." (Doc. 111 at 17 (citing *Stephens v. DeGiovanni*, 852 F.3d 1298, 1317 (11th Cir. 2017)). Plaintiff contends that "Turner's handcuffing of an otherwise calm and compliant child" like K.R. when Officer Ramos arrived to transport her to the JAC, "was clearly disproportionate to the situation." (*Id.*). "At a minimum," Plaintiff contends, summary judgment on qualified immunity for Officer Turner should be denied because there is a genuine issue of material fact as to whether Turner handcuffed K.R. as a "compliant elementary school student" in this case "for purely punitive purposes." Plaintiff argues that Officer Turner used "excessive force" by handcuffing K.R. where she had calmed down and was sitting in the administrator's office, separate from the other children. By the time Officer Turner actually arrested K.R. at 9:33 a.m., after Officer Ramos arrived to transport her and spent time talking to Officer Turner, it is undisputed that K.R. had "de-escalated for 15-20 minutes" and was sitting calmy reading a book, as can be seen on the BWC videos. (Docs. 117-1, 117-2).[35]

Plaintiff argues that the facts of K.R.'s case are virtually identical to the facts in the Eleventh Circuit case of *Gray ex rel. Alexander v. Bostic,* in which the plaintiff

---

[35] It is not made clear in the record why it was not possible to wait for K.R.'s uncle to come to the School and pick her up when he got off work in 30 minutes, as he had done in the past, rather than arrest K.R. after she had calmed down.

argued the deputy had used excessive force in detaining a nine year old because the
deputy lacked a right to detain her at all. 458 F.3d 1295, 1304 (11th Cir. 2006). The
Eleventh Circuit in *Gray* treated the "excessive force" claim as "subsumed in her
illegal seizure claim" and *not* as an independent or discrete claim. *Id.* The Court finds
the same analysis applies here—because Officer Turner lacked probable cause to
arrest K.R., Plaintiff's claim for excessive force is "subsumed" in her Fourth
Amendment illegal seizure/false arrest claim and is not a discrete claim. *See
Richmond v. Badia*, 47 F.4th 1172 (11th Cir. 2022) (contrasting an "artificial claim"
where "an officer's use of force is excessive only because an arrest was not
supported by probable cause" with a "genuine excessive force claim" where
"irrespective of an officer's probable cause to make an arrest, the officer used
excessive force") (citing *Gray*, 458 F.3d at 1304).[36] Therefore, as applied to K.R.'s
case, the standard the Court must apply is not whether the force used to apply the
flexicuffs was "reasonable" under *Graham*, but whether the officer applied the
handcuffs for punitive reasons rather than incident to a crime that had been
committed.

In *Gray*, the school resource officer handcuffed a nine-year-old child for
making a single disrespectful remark to a teacher, even though there was no

---

[36] The Eleventh Circuit noted that a plaintiff "cannot double recover—once for false
arrest and again for excessive force—when the absence of probable cause is the only thing that
makes an officer's use of force unreasonable." *Richmond*, 47 F.4th at 1180-81.

indication of a potential threat to anyone's safety, the child promptly complied with
another teacher's instructions after her initial comment, and she was not engaging in
any further disruptive behavior. 458 F.3d at 1306. The Eleventh Circuit noted that
the school resource officer had admitted the reason for placing the handcuffs on the
child was to "impress upon her the serious nature of committing crimes" and to "rid
herself of her disrespectful attitude" in the future, and not because the child presented
"a potential threat to anyone's safety." *Id.* at 1305-06. The Court found that the
"Deputy's [] purpose in handcuffing Gray was not to pursue an investigation to
confirm or dispel his suspicions that Gray had committed a misdemeanor . . . [but]
was simply to punish her and teach her a lesson. Every reasonable officer would
have known that handcuffing a compliant nine-year-old child for purely punitive
purposes is unreasonable." *Id.* at 1307. "[T]he handcuffing was excessively intrusive
given [the child's] young age and the fact that it was not done to protect anyone's
safety. Therefore, the handcuffing of [the child] violated [her] Fourth Amendment
rights." *Id.* at 1306. In a subsequent post-judgment appeal, the court made clear that
the deputy had "lacked even arguable probable cause to arrest Gray." *Gray ex rel.
Alexander v. Bostic*, 264 F. App'x 856 (11th Cir. 2008) ("[V]iewing the evidence in
the light most favorable to Deputy Bostic, he lacked even arguable probable cause
to arrest Gray.").

Officer Turner argues that *Gray* does not apply in K.R.'s case because the
Eleventh Circuit made a point of clarifying that the holding in *Gray* does not
preclude "handcuffing a child during a *Terry* stop based on reasonable suspicion"
because it is "not per se unlawful" and would be permissible under certain
circumstances. (Doc. 119 at 2 n.1 (citing *Gray*, 458 F.3d at 1307 ("We emphasize
that the Court is not saying that the use of handcuffs during an investigatory stop of
a nine-year-old child is always unreasonable, but just unreasonable under the
particular facts of this case.")). Officer Turner extrapolates from the court's
statement in *Gray* that "handcuffing a child during an arrest based on probable
cause" would also not be per se unlawful, and he had probable cause. (Doc. 119 at 2
n.1). However, the Court has already rejected his arguments that he had even
arguable probable cause for the reasons explained *supra*.

Officer Turner also contends that "arresting elementary school-aged children"
is "not as foreign as Plaintiff might have it," citing various OPD statistics on the
numbers of children under age 11—not age 6—arrested in the five years before
K.R.'s arrest. (Doc. 89 at 23 (citing Doc. 89-2 at 88-91)). This argument is unhelpful,
however, because the same statistics on which Officer Turner relies from the OPD
Reports regarding the total arrests of juveniles under age 11 (compiled by Plaintiff's
expert), also show that *no* six-year-olds had been arrested in the five years before
Officer Turner's arrest of K.R. (Doc. 89-6 (Dekmar) at 131-33).

The Court finds, viewing the facts in the light most favorable to Plaintiff, including that Ms. Stoute did not want to pursue charges for battery and K.R. lacked the intent to purposely injure her, Officer Turner's conduct was objectively unreasonable and a violation of K.R.'s Fourth Amendment rights.

### d. Clearly Established

As to the second element of the qualified immunity analysis, the Court must consider, as to Plaintiff's § 1983 claim for false arrest and handcuffing of K.R., whether the law was "clearly established" that handcuffing a six-year-old was a violation of her Fourth Amendment rights. An officer conducting a warrantless arrest is "entitled to qualified immunity where clearly established law does not show that the [arrest] violated the Fourth Amendment." *Pearson*, 555 U.S. at 244. "This inquiry turns on the 'objective legal reasonableness of the action, assessed in light of the legal rules that were clearly established at the time it was taken.'" *Wilson v. Layne,* 526 U.S. 603, 614 (1999) (internal quotation marks omitted); *see Hope v. Pelzer,* 536 U.S. 730, 741 (2002) "[T]he salient question that the [lower c]ourt [] ought to [] ask[] is whether the state of the law [at the time of the incident] gave respondents fair warning that their alleged treatment of [plaintiff] was unconstitutional.").

Although Officer Turner recognizes that the arrest of a young child differs from an adult, he argues "there is nothing categorically unconstitutional about the

arrest of a child under ten." (Doc. 89 at 18). He argues that, prior to the Florida legislation passed in 2021 in the wake of K.R.'s arrest that is named after her, Florida has "long permitted custodial arrests of six-year-olds for misdemeanors." (Doc. 89 at 18). Officer Turner argues at the time of K.R.'s arrest in September 2019, there was no "clearly established" law proscribing the "custodial arrest of a six-year-old misdemeanor suspect," and Plaintiff failed to identify any on-point authority existing in a pre-September 2019 decision from the Supreme Court, Eleventh Circuit, or Florida Supreme Court to the contrary in her Response.

Officer Turner contends that a reasonable officer in his position would have "believed that arresting a six-year-old for misdemeanor [battery] was supported by the law" based on a 1988 Florida appellate court opinion in a tort case against a convenience store, *Southland Corp. v. Bartsch*, 522 So.2d 1053 (Fla. 5th DCA 1988). He cites *Southland* for the principle that the young age of a kindergartener arrested for stealing gum was "irrelevant" in a subsequent lawsuit against the store on a malicious prosecution tort claim. (*Id.* at 19). Officer Turner argues that even though *Southland* was not a "formal civil rights decision," it provides "strong evidence that reasonable officers in Officer Turner's position would have reasonably believed that arresting a six-year-old for a misdemeanor was supported by the law." (Doc. 89 at 19). He also argues that reliance on the *Southland* decision by the

Eleventh Circuit in a different case is "evidence that federal law does not categorically proscribe such arrests." (*Id.*).

As an initial matter, the decision is not one rendered by the state supreme court, so reliance on it is not on the firmest of footing. More important, the facts of *Southland* are easily distinguished from the facts in this § 1983 case in light of clear Eleventh Circuit case law which requires this court to determine whether arguable probable cause exists for qualified immunity to apply. Notably, in *Southland,* the criminal case was *dropped* due to "the extreme youth of the offender," leading the parent to file suit against the store for malicious prosecution; however, the appellate court found that probable cause existed as a matter of law because the child had admitted to stealing gum from the store and the state attorney had "clearly stated that there was probable cause to arrest." *Id.* at 1055-56 (reversing trial judge's submission of the malicious prosecution question to the jury). In this case, the Court has already determined that Officer Turner lacked arguable probable cause and that determination is at the heart of the question of qualified immunity.

As Plaintiff acknowledges, the law in Florida named after K.R. was not amended until 2021, which was two years after K.R. was arrested and was a direct response to the public outcry regarding her arrest. However, Plaintiff argues that Officer Turner's conduct violated K.R.'s "clearly established constitutional right

demonstrated by the pre-existing binding precedent [in *Gray*] putting officers on notice that the use of handcuffs for punitive purposes is unlawful." (Doc. 111 at 2).

Officer Turner argues that *Gray* did not "clearly establish" that a minor can never be placed in handcuffs but "merely establishes that a school officer may not seize a student in the constitutional sense for solely pedagogical purposes and where no criminal activity is even arguably afoot." (Doc. 119 at 2). Officer Turner argues that his handcuffing of K.R. is distinguishable from the situation in *Gray* because K.R.'s arrest was incident to a lawful arrest for misdemeanor battery, which was not present or anticipated by the officer in *Gray*.

Officer Turner is correct that placing handcuffs on an adult arrestee incident to a misdemeanor arrest generally would not constitute a Fourth Amendment violation under Supreme Court doctrine. *See, e.g., Atwater v. City of Lago Vista*, 532 U.S. 318, 354–55 (2001) (holding that embarrassment associated with officer's handcuffing of the arrestee before placing her in a patrol car during a lawful arrest for misdemeanor seatbelt offense cannot support § 1983 claim for violation of Fourth Amendment). However, such cases involving handcuffing of adults arrested for misdemeanors are clearly distinguishable from the handcuffing of a six-year-old child.

There are numerous cases which highlight the significant differences in physical size and the use of force on elementary age children, as well as the primary

role school staff have in disciplining young children at school versus the role of law
enforcement officers placed at schools primarily to protect schoolchildren from
outside threats. Officer Turner argues that evidence produced in discovery by OPD
shows that dozens of children "under age 11" were arrested in the five years before
K.R.'s arrest as follows: 2014 (16); 2015 (17); 2016 (22); 2017 (23); 2018 (9); 2019
(4). (*See* Doc. 89-6 (Dekmar Dep.) at 126).[37] He argues that, based on the number
of children under age 11 arrested in the City in the years leading up to K.R.'s arrest,
the Court should find that it is "constitutional to arrest elementary-aged children
when probable cause supports it." Alternatively, Officer Turner argues, "the
contours of arresting a child under ten are jurisprudentially unclear," thus, the law
precluding such an arrest was not "clearly established" at the time of K.R.'s arrest
and Officer Turner is entitled to qualified immunity.

Officer Turner's reasoning is directly contradicted by the Eleventh Circuit's
holding in *Gray*, decided in 2006, which put Officer Turner on notice that his use of
handcuffs for a purpose other than investigating a crime, or protecting the safety of
others, and for purely "punitive purposes" or "discipline" of a student is objectively
unreasonable for Fourth Amendment purposes. As the Eleventh Circuit held in *Gray*,
the right of a young child to be free of handcuffing for discipline purposes rather

---

[37] Officer Turner's argument is undercut by the same statistics in that no other children six
years of age were arrested in the five years before K.R.'s arrest. (Doc. 89-6 at 133).

- 66 -

than public safety was "clearly established" because the rule applied with "obvious

clarity":

> Whether a constitutional right was "clearly established" at the time of
> the violation turns on "'whether it would be clear to a reasonable officer
> that his conduct was unlawful in the situation he confronted.'" *Bashir*,
> 445 F.3d at 1330 (quoting *Saucie*r, 533 U.S. at 202). We focus on the
> status of the law in March 2003 when Deputy Bostic detained and
> handcuffed Gray.
>
> It is well settled that, under the Fourth Amendment, "[t]he scope of a
> detention must be carefully tailored to its underlying justification" and
> that the "investigatory methods employed [during a detention] should
> be the least intrusive means reasonably available to verify or dispel the
> officer's suspicion in a short period of time." *Florida v. Royer*, 460 U.S.
> 491, 500, 103 S.Ct. 1319, 1325–26, 75 L.Ed.2d 229 (1983). As we have
> already discussed, this Court has long concluded that it is reasonable
> for officers to use handcuffs to protect themselves during an
> investigative detention. *See Hastamorir*, 881 F.2d at 1556–57;
> *Kapperman*, 764 F.2d at 790 n. 4. However, Gray does not cite and we
> cannot locate a case addressing before today when it may be reasonable
> to use handcuffs in an investigatory stop absent a safety rationale. Thus,
> no factually similar pre-existing case law put Deputy Bostic on notice
> that his use of handcuffs to discipline Gray was objectively
> unreasonable for Fourth Amendment purposes.
>
> However, our inquiry does not end here. Even in the absence of
> factually similar case law, an official can have fair warning that his
> conduct is unconstitutional when the constitutional violation is obvious,
> sometimes referred to as "obvious clarity" cases. *See United States v.
> Lanier*, 520 U.S. 259, 271, 117 S.Ct. 1219, 1227, 137 L.Ed.2d 432
> (1997) ("[A] general constitutional rule already identified in the
> decisional law may apply with obvious clarity to the specific conduct
> in question, even though the very action in question has [not] been
> previously held unlawful." (quotation marks omitted)); *Vinyard v.
> Wilson*, 311 F.3d 1340, 1350–51 (11th Cir. 2002).
>
> The Fourth Amendment's general proscription against "unreasonable"
> seizures seldom puts officers on notice that certain conduct is unlawful

under precise circumstances. *Evans v. Stephens*, 407 F.3d 1272, 1283 (11th Cir. 2005) (en banc). Nonetheless, on rare occasion we have concluded that general Fourth Amendment principles make the constitutional violation obvious. *See, e.g., id.* at 1283 (concluding that the constitutional violation was obvious where an officer conducted body cavity searches in a degrading and forceful manner and when there was no need for immediate action); *Vinyar*d, 311 F.3d at 1355 (concluding that the constitutional violation was obvious where the officer grabbed the arrestee by the hair and arm and applied pepper spray after she had been handcuffed and secured in the back of the patrol car); *Lee v. Ferraro*, 284 F.3d 1188, 1198–99 (11th Cir. 2002) (concluding that the constitutional violation was readily apparent where an officer slammed the arrestee's head against the trunk after she was handcuffed, secured and any risk of danger or flight had passed); *Priester v. City of Riviera Beach*, 208 F.3d 919, 927 (11th Cir. 2000) (concluding that the constitutional violation was obvious where an officer permitted his dog to attack a handcuffed, compliant arrestee for two minutes and then threatened to kill the arrestee when he kicked the dog in an effort to resist the attack). In these cases, the officer's conduct at issue lay "so obviously at the very core of what the Fourth Amendment prohibits that the unlawfulness of the conduct was readily apparent to [him] notwithstanding the lack of [fact-specific] case law." *Lee*, 284 F.3d at 1199 (internal quotation marks omitted). Put another way, the officer's conduct in these cases was "well beyond the 'hazy border' that sometimes separates lawful conduct from unlawful conduct," such that every objectively reasonable officer would have known that the conduct was unlawful. *Evans*, 407 F.3d at 1283.

We likewise conclude that Deputy Bostic's conduct in handcuffing Gray, a compliant, nine-year-old girl for the sole purpose of punishing her was an obvious violation of Gray's Fourth Amendment rights. After making the comment, Gray had complied with her teachers' and Deputy Bostic's instructions. Indeed, one of the teachers had informed Deputy Bostic that she would handle the matter. In addition, Deputy Bostic's purpose in handcuffing Gray was not to pursue an investigation to confirm or dispel his suspicions that Gray had committed a misdemeanor. Rather, Deputy Bostic's purpose in handcuffing Gray was simply to punish her and teach her a lesson. Every reasonable officer would have known that handcuffing a compliant nine-year-old child for purely punitive purposes is unreasonable. . . . Therefore,

- 68 -

> Deputy Bostic is not entitled to qualified immunity, and the district
> court properly denied summary judgment in his favor.

*Id.* at 1306-07. Here, as in *Gray*, after the School staff had contained K.R.'s attempted elopements, she was calmly sitting and reading a book with Ms. Stoute when Officer Turner entered the office with Officer Ramos to arrest K.R. At that point, Officer Turner's purpose in handcuffing K.R. was to discipline her and stress to her family that her conduct should be taken more seriously because it was being repeated, suspensions were not curtailing it, and Officer Turner was skeptical it was related to "sleep apnea" or a medical condition.

Under the "obvious clarity" prong the Court may consider cases from other circuits in determining whether the law was "clearly established." *See Gilmore,* 2025 WL 1911728 at *11. Courts in this Circuit and others have held that the handcuffing of older students who were resisting or attempting to flee is not unreasonable, similar to arrests of adults, applying *Graham*. *See, e.g., J.I.W. v. Dorminey*, No. 21-12330, 2022 WL 17351654, *6 (11th Cir. Dec. 1, 2022) (per curiam) (finding that officer's handcuffing of disruptive thirteen year old middle school student, resisting restraint after punching a locker and moving in administrator's direction, was not "obviously" unlawful); *K.W.P. v. Kansas City Public Schools*, 931 F.3d 813, 826 (8th Cir. 2019) (holding that an officer did not violate an elementary student's Fourth Amendment rights by handcuffing him where the student admitted he was "aggressively trying to pull away" from officer and attempting to flee); *cf. Hedgepeth ex rel. Hedgepeth*

*v. Wash. Metro. Area Transit Authority*, 386 F.3d 1148, 1155–56 (D.C. Cir. 2004)

(finding officer had probable cause to arrest and handcuff a twelve-year-old girl who

violated D.C. metro rules against eating in transit facilities in his presence and "zero

tolerance" policy was in place) (citing *Atwater*).

However, cases from other circuit courts have held that handcuffing "a calm,

compliant" child is "excessive" and unreasonable when there is no longer a safety

concern or potential to flee and the child is kept away from other children or confined

by school staff. *E.W. by & through T.W. v. Dolgos*, 884 F.3d 172, 180-81 (4th Cir.

2018) (finding that handcuffing a "ten-year-old . . . on school grounds because she

hit another student during a fight several days prior" was unreasonable); *see C.B. v.

City of Sonora*, 769 F.3d 1005, 1030 (9th Cir. 2014) (holding that an officer used

excessive force by placing "handcuffs on a calm, compliant, but nonresponsive 11–

year–old child" surrounded by five adults based on justification that the officer was

"told [the child] might run away"); *Tekle v. United States*, 511 F.3d 839, 846 (9th

Cir. 2007) (finding that officers used excessive force in handcuffing a child at his

home because twenty officers were present, he "was cooperative and unarmed and,

most importantly, he was eleven years old"); *Jean-Baptiste on behalf of Jean-

Baptiste v. Jones*, 424 F. Supp. 3d 1251, 1256 (S.D. Fla. 2019) (explaining that the

plaintiff who threw eggs from a school bus "posed no immediate threat to the

officers' safety" because he "was a thirteen-year-old who stood just four feet, eleven

inches tall and weighed seventy pounds," "he had no weapon," and "he was inarguably confined, without egress, to the center aisle of a school bus"). *But see A.M. v. Holmes*, 830 F.3d 1123, 1152 (10th Cir. 2016) (affirming qualified immunity for officer who arrested seventh grader for disrupting class with fake burping on false arrest and excessive force claims); *Digennaro v Malgrat*, No. 4:20-cv-10094-KMM, 2021 WL 3025322, (S.D. Fla. June 14, 2021) (granting summary judgment to officers on excessive force claim in felony arrest of eight year old boy with anger issues who threatened and intentionally struck teacher—who pressed charges—was supported by probable cause and force used in attempt to handcuff him was *de minimis*).

Another judge of the Middle District, in *D.L. by and through S.L and R.L. v Hernando County Sheriff's Office*, considering § 1983 claims for the handcuffing of a "ninety-pound, unarmed, ten-year-old" denied qualified immunity to the arresting officer finding that the law was "clearly established" based on the similar facts in *Gray*:

> [*Gray*] stands for the proposition that school resource officers should not handcuff young students who may have committed minor offenses but who do not pose an immediate threat to other students' safety and will not evade arrest. *Gray ex rel. Alexander*, 458 F.3d at 1306. While *Gray ex rel. Alexander* is not perfectly analogous to this case, perfection is not the standard.

620 F. Supp.3d 1182, 1196 (2022). The district court denied qualified immunity to the handcuffing officer on the Fourth Amendment violation where there was "no

indication" that the ten-year-old student "was posing a threat" to the deputy or others at the time he was placed in handcuffs because he was isolated, away from his classmates, and in the school office under the supervision of the deputy and school personnel. *Id.* "The opinion in [*Gray*], which involves materially similar facts to the case at hand, put SROs on notice and gave Deputy Smith a clear warning that handcuffing a small child who was neither resisting arrest nor posing a substantial threat to others violated the child's Fourth Amendment rights." *Id.* at 1197.

Regardless of which basis the Court applies here to determine the law is "clearly established"—the "obvious clarity" described in *Gray* or the facts of *Gray* as having similar facts directly on point—the Court finds that the law was "clearly established" that handcuffing a compliant six-year-old who was not fleeing or resisting to demonstrate the "seriousness" of her misbehavior or punish her violated the child's Fourth Amendment rights. Accordingly, Officer Turner is not entitled to qualified immunity and his motion for summary judgment will be denied.

### 4. Supervisor Liability (Count IV)

Plaintiff alleges that Chief Rolon and Sergeant Andreacchi, as supervisors, allegedly violated K.R.'s constitutional rights by approving, endorsing, condoning, or failing to stop Officer Turner in arresting K.R. Both senior law enforcement officer Defendants seek summary judgment on Plaintiff's claims against them.

Supervisory officials cannot be held liable for unconstitutional actions by their subordinates based on *respondeat superior* or vicarious liability. *Hartley v. Parnell*, 193 F.3d 1263, 1269 (11th Cir. 1999). Both sides cite *Keating v. City of Miami*, which holds that supervisory liability arises "when the supervisor personally participates in the alleged constitutional violation or when there is a causal connection between actions of the supervising official and the alleged constitutional violation." 598 F.3d 753, 762 (11th Cir. 2010) (citation omitted). "The difference between a direct failure to intervene claim and a failure to stop claim under a theory of supervisory liability lies in the position and authority of the defendant with respect to the person who commits the constitutional violation." *Id.* at 765. The causal connection can be established "when facts support an inference that the supervisor directed the subordinates to act unlawfully or knew that the subordinates would act unlawfully and failed to stop them from doing so." *Mercado v. City of Orlando*, 407 F.3d 1152, 1158 (11th Cir. 2005) (emphasis added).

### a. **Chief Rolon**

Chief Rolon argues that he is entitled to qualified immunity from Plaintiff's claims because the record is uncontroverted that he was not Officer Turner's supervisor, he had no involvement whatsoever in K.R.'s arrest, and he did not even learn about it until K.R. had been released from the JAC. (Doc. 92). He further argues that he did not ratify the actions of the officers; instead, he immediately

initiated an Internal Affairs investigation that resulted in the termination of Officer

Turner and a sanction of PTO forfeiture for Sergeant Andreacchi. Chief Rolon also

points out that he directed the state attorney's office the same day of the arrest to

ensure that no prosecution occur and expunge K.R.'s record. (*Id.*).[38]

Plaintiff failed to address in her Response (Doc. 112) any of the arguments

raised by Chief Rolon. In his Reply, Chief Rolon argues that Plaintiff's Response is

"glaringly silent" in opposition to his summary judgment arguments. (Doc. 118).

The Court agrees. Failure to respond to Chief Rolon's well-supported arguments

dooms Plaintiff's claim for supervisory liability against him, and he is entitled to

summary judgment on her claim for supervisory liability.

### b. Sergeant Andreacchi

Sergeant Andreacchi argues that even if Plaintiff can show a constitutional

violation by Officer Turner,[39] the supervisory liability claim against him would still

fail because, where the officer is not present at the scene, supervisory liability only

attaches when the defendant is in the arresting officer's direct chain of command.

(Doc. 90 at 23 (citing *Brown v. City of Huntsville, Ala.*, 608 F.3d 724, 737 (11th Cir.

2010)). Sergeant Andreacchi contends that there is no evidence that he was in Officer

---

[38] Chief Rolon also notes that Plaintiff's expert had no criticism of Rolon's actions. (Doc. 92 (citing Doc. 89-6 (Dekmar Dep.) at 124).

[39] The Court has determined *supra* that there was no constitutional violation by Officer Ramos.

Turner's chain of command or that he had the authority to stop Officer Turner from arresting K.R.

Plaintiff responds that Sergeant Andreacchi "knew what was happening, had the power to prevent it, and he did nothing to stop the constitutional violations that ensued" because he "gave no guidance, nor did he choose to direct the officers to leave K.R. with her family following her tantrum." (Doc. 113 at 14). Plaintiff argues that Sergeant Andreacchi is liable for "acquiescing" in K.R.'s arrest and her handcuffing, and the "decision to permit Officer Turner's unlawful conduct." (*Id.* at 16). Plaintiff argues that she is alleging a supervisory liability claim that is similar to a failure to intervene claim, but the difference "lies in the position and authority of the defendant with respect to the person who commits the constitutional violation." *Keating*, 598 F.3d at 765 (citation omitted). She argues that, under a supervisory "failure to stop" claim, a plaintiff need not show the "necessity or real opportunity" for the supervisory defendant to intervene in another officer's unlawful conduct. (Doc. 113 at 18 (citing *Id.* at 764-65)). Instead, Plaintiff argues that she is only required to demonstrate that the supervisor had the ability to prevent or discontinue the constitutional violation by exercising his authority over the subordinate but failed to do so.

Plaintiff points to Sergeant Andreacchi's testimony that he could theoretically "stop someone" of a "lesser rank . . . if they are violating a policy in the

arrest of a minor under the age of 11." (Doc. 90-6 at 46). Plaintiff argues that
Sergeant Andreacchi's "self-serving Affidavit" (Doc. 90-8) does not alter his
testimony on this point because he was in direct communication with Officer Turner
about K.R.'s arrest and yet did not require Officer Turner to "comply with
department policy and obtain approval of the watch commander." (Doc. 113 at 17).
As to Plaintiff's argument that Sergeant Andreacchi is liable because he did not "stop
the unlawful arrest himself" by telling Officer Turner to avoid filing the charges
leading to an arrest, he testified that Turner had done the investigation, the little
Sergeant Andreacchi knew "met the threshold of probable cause," and "officers have
discretion on how they're going to handle situations." (*Id.*). Even though Sergeant
Andreacchi "recognized that there were other options than arresting K.R. that may
have avoided [] constitutional violations," he did not order Defendant Turner to
"change course" but was found to have "relegated his responsibilities to Officer
Ramos, and North Patrol Division Commander found these efforts were 'wholly
insufficient.'" (*Id.* at 55; Doc. 112-1). On these points, Plaintiff ignores Sergeant
Andreacchi's testimony that he *failed to remember* the Policy requiring watch
commander approval (Doc. 90-6 at 56), and he was sanctioned with a PTO forfeiture
after the Internal Affairs investigation. (Doc. 89-2 at 77). Moreover, violation of a
law enforcement agency's internal policy, while potentially negligent, does not

transform Sergeant Andreacchi's conduct into a constitutional deprivation. *Rooney v. Watson*, 101 F.3d 1378, 1381 (11th Cir. 1996).

Plaintiff argues that the facts in the case Sergeant Andreacchi cites, *Brown v. City of Huntsville, Alabama*, 608 F.3d 724, 737 (11th Cir. 2010), on a supervisory liability claim, are distinguishable. (Doc. 113 at 18). In *Brown*, the court found the defendant officer did not have supervisory control over the arresting officer because the defendant officer was busy with a separate arrest and was not even aware of the arrest at issue when it took place. *Id.* Plaintiff argues that K.R.'s case presents a "distinctly different scenario" from that of *Brown* because Sergeant Andriacchi was repeatedly informed about K.R.'s arrest as Officer Ramos sought his advice leading up to the arrest, and when Officer Turner talked with him, Sergeant Andreacchi did nothing to prevent the arrest or use of flexicuffs on K.R. Plaintiff argues that Sergeant Andreacchi (1) had the ability to prevent or discontinue Officer Turner's constitutional violations by exercising his authority over him; and (2) subsequently failed to exercise that authority to stop the constitutional violations.

Sergeant Andreacchi argues in Reply that Plaintiff's attempts to distinguish *Brown* fail for the reasons explained by Judge Honeywell of the Middle District in the case of *Bratt v. Genovese*, where she granted summary judgment on a false arrest claim against a senior officer because there was no evidence that the officer had participated in the plaintiff's arrest or had the authority to order the plaintiff's arrest.

No. 8:13-cv-3210-T-36-AEP, 2015 WL 12835684, *8-9 (M.D. Fla. Nov. 23, 2015),

*aff'd,* 660 F. App'x 837 (11th Cir. 2016). Judge Honeywell noted that the plaintiff's

argument failed in *Bratt* because "*Brown* did not turn on the fact that the higher

ranked officer was not aware that the arresting officer was arresting the plaintiff.

Rather, it turned on the fact that "[he] did not arrest [plaintiff] and had no supervisory

control over the officer who did." *Id.* at *9 (citing *Brown*, 608 F.3d at 737). Applying

the analysis of *Brown* and *Bratt* in this case, Sergeant Andreacchi understood that

he had no supervisory control over Officer Turner's decision to arrest K.R., even

though he tried very hard to persuade him to follow a different path. It is undisputed

that Sergeant Andreacchi was not physically present at the arrest. It is also

undisputed that he was the patrol sergeant and directly supervised a group of patrol

officers (called the "Bravo-Bravo-Day" group), such as Officer Ramos, but did *not*

supervise reserve officers like Officer Turner, who was in the chain-of-command

under the Special Patrol Section Commander within the Reserve ranks. Accordingly,

Sergeant Andreacchi is entitled to summary judgment on the claim of supervisory

liability.

### 5. *Monell* Claim against the City (Count V)

Plaintiff alleges a *Monell* claim for municipal liability against the City (Count

V), arguing that the City had a "custom of ignoring departmental policies designed

to protect children from unconstitutional arrests" which "was the moving force

behind Defendant Turner's actions" in "ignoring City policies and procedures in dealing with juveniles." (Doc. 112 at 1-2). Plaintiff also argues that the City failed to train, supervise, and discipline its officers related to the arrest of juveniles.

The City argues that it is entitled to summary judgment on Plaintiff's *Monell* claims because they are contradicted by evidence in the record. (Doc. 92). The City argues that K.R.'s arrest was not the result of a City policy or custom, nor was the City deliberately indifferent to a serious need for training regarding a history, pattern, or custom of unlawfully arresting young children. Rather, the City contends, for more than a year before K.R. was arrested, it had in place Policy 1204.7 governing juvenile arrests, and had Officer Turner followed that policy, the arrest of K.R. would not have occurred. The City also argues that Plaintiff cannot show it had a custom or policy that was the "moving force" behind K.R.'s arrest based on this single incident, and accordingly, her claim for *Monell* liability must fail.

### a. Municipal Liability Standards under *Monell*

When the defendant is a municipality, the plaintiff can establish liability by demonstrating that an action occurred "pursuant to [an] official municipal policy of some nature." *Monell v. Dep't of Soc. Servs. of the City of N.Y.*, 436 U.S. 658, 691 (1978). A plaintiff can establish the requisite "official policy" in one of two ways: (1) by identifying an officially promulgated policy; or (2) by identifying an unofficial custom or practice shown through the repeated acts of the final

policymaker of the entity. *Grech v. Clayton Cnty.*, 335 F.3d 1326, 1329 (11th Cir.

2003).

Municipalities are responsible for "deprivations resulting from the decisions

of its duly constituted legislative body or of those officials whose acts may fairly be

said to be those of the municipality." *Bd. of Cty. Comm'rs of Bryan Cnty. v. Brown*,

520 U.S. 397, 403–04 (1997). However, municipalities are not liable under § 1983

for random or isolated occurrences or for conduct of which the officials were

unaware. *Depew v. City of St. Marys*, 787 F.2d 1496, 1499 (11th Cir. 1986).

Therefore, although a plaintiff need not demonstrate that a behavior received formal

approval by officials, there must be a showing of actual or constructive knowledge.

*Id.* A plaintiff must identify the policy or custom which caused his injury so that

liability will not be based upon an isolated incident, *McDowell v. Brown*, 392 F.3d

1283, 1290 (11th Cir. 2004), and the policy or custom must be the moving force

behind the constitutional violation. *Grech*, 335 F.3d at 1330.

### b. Failure to Train, Supervise, or Discipline Officer Turner

Plaintiff argues summary judgment should be denied to the City because

Officer Turner's "lack of qualifications and training" allegedly as a school resource

officer "show the City's widespread failures regarding adherence to policies and

established standards related to the arrests of juveniles." (Doc. 112 at 3). She argues

that Officer Turner failed to attend required school resource officer training courses,

including allegedly the training on Policy 1204.7, prior to working at the charter

School. (*Id.*). Plaintiff also contends that "widespread deficiencies within OPD

reporting erode the ability to hold officers accountable." (*Id.* (citing Doc. 91-2,

Dekmar's Rebuttal Report[40]).

"A municipality is liable for a failure to train or supervise only when the

municipality's 'official policy' causes a constitutional violation." *Riccio v. City of

Daytona Beach*, No. 608-cv-2050, 2009 WL 10706175, at *3 (M.D. Fla. Oct. 5,

2009) (Conway, J.) (citing *Monell*). A municipality's failure to train its police

officers regarding their duty not to violate citizens' constitutional rights can rise to

the level of policy where the failure to train is the result of the municipality's

deliberate indifference toward constitutional rights. *Connick v. Thompson*, 563 U.S.

51, 61 (2011); *Gold v. City of Miami*, 151 F.3d 1346, 1350 (11th Cir. 1998). The

practice must be "so pervasive as to be the functional equivalent of a formal policy."

*Grech*, 335 F.3d at 1330 n.6.

A plaintiff can prove a municipality's deliberate indifference in one of two

ways. First, a municipality is deliberately indifferent to constitutional rights where

there is a widespread pattern of similar constitutional violations by untrained

---

[40] The City has moved to strike the *Monell* liability opinions in Dekmar's Rebuttal Report
which it argues contained untimely produced "new" opinions inappropriate as "rebuttal." (Doc.
109). Given the ruling on the *Monell* issues as set forth *infra*, the Court need not rule on the Motion
to Strike.

employees. *Connick*, 563 U.S. at 62. The plaintiff must show prior instances of constitutional violations by officers that would have put the municipality on notice of the need for improved training to address this misconduct, and that the municipality made a deliberate choice not to take any action. *Gold*, 151 F.3d at 1350. However, a single incident would not be pervasive enough to constitute a custom or practice. *Riccio*, 2009 WL 10706175, at *3.

Alternatively, a municipality can be liable for a single incident where "the need for more or different training is so obvious, and the inadequacy [in training is] so likely to result in the violation of constitutional rights, that the policymakers . . . can reasonably be said to have been deliberately indifferent." *City of Canton v. Harris*, 489 U.S. 378, 390 (1989). "For [a plaintiff's] *Monell* claim to survive summary judgment, [s]he must bring forth some evidence of a pattern of improper training to sustain h[er] claim, and [s]he must show that [the City] was aware of the deficiencies in the program." *Mercado*, 407 F.3d at 1161.

Plaintiff argues that Officer Turner's failure to attend the school resource officer courses and his lack of qualifications show that the City has "inadequate procedures for the handling, recording, and reviewing of juvenile arrests" which were "the moving force behind" Officer Turner's actions, and they "demonstrate a clear and widespread disregard for established law enforcement standards." (*Id.* at 13). Plaintiff argues that "the record shows that the policy of arresting little children

by Orlando [school resource officers] amounts to deliberate indifference to the constitutional rights of children, including K.R." (*Id.* at 14).[41]

The City cites Eleventh Circuit precedent that, without evidence of a history of widespread prior abuse, a municipality is not liable as a matter of law for any failure to train and supervise. (Doc. 92 at 19 (citing *Gold*, 151 F.3d at 1351)). The City argues that Plaintiff's evidence must meet a "rigorous standard to establish a widespread pattern of abuse" by the municipality, and there is no evidence in this case that Officer Turner was "unfit" for the "armed security guard" duty at the charter School or that he was, in fact, a "school resource officer *assigned by the City* to the [charter School]" as Plaintiff erroneously alleges. (*Id.* at 20). The Court agrees.

The undisputed evidence in this case shows that Officer Turner was actually a retired OPD officer, working as a Reserve Officer, who the charter School selected—without input or assignment by the City—from a list of reserve officers available to serve private duty details like the one at the charter School, which was not required under Florida law to have an official "school resource officer." (Doc. 89-1 at 36-38; Doc. 89-2 at 46, 50; Doc. 92-4 ¶¶ 6-7). Plaintiff's only reference to the contrary is based on a passing comment in the Internal Affairs Inquiry

---

[41] Plaintiff does not allege that use of flexicuffs on K.R. was a "custom or policy" for which the City has *Monell* liability. Plaintiff's expert testified that the City's policy required officers to consider factors such as subject's age, size, physical condition, and mental capacity in determining whether to apply handcuffs, and he conceded that the handcuffing of K.R. was Officer Turner's failure to consider the factors in the OPD Policy. (*See* Doc. 89-6 (Dekmar Dep.) at 119).

Investigation Report that which described "Reserve Officer" Turner as "working as a School Resource Officer." (Doc. 112 at 2 n.2, 19 (citing 100-1 at 2)). The author of the Report uses the term loosely to describe Officer Turner as working at a school. It is undisputed, as Chief Rolon explained, although the traditional public schools were mandated to have official school resource officers, charter schools could select and hire reserve officers to work extra duty jobs if they needed extra security, and Officer Turner signed up to work the extra duty job posted for the School in this case. (Doc. 89-2 at 50; Doc. 92-4 ¶¶ 6-7). It is also undisputed in the record that the City had required Officer Turner to review Policy 1204.7 after it was implemented, in the 12 months prior to K.R.'s arrest, but failed to follow it. Accordingly, summary judgment is warranted in favor of the City on the failure to train claim.

The City also argues that "there is not a scintilla of evidence of the requisite 'widespread history or pattern of unlawful arrests' of six-year-olds" for *Monell* liability that Plaintiff alleges. The uncontroverted evidence is that in the five years prior to the incident involving K.R., there is not a single arrest of a 6-year-old by OPD, and there are only three arrests total of children seven or eight years old in the five-year period. (Doc. 92 at 21-22 (citing Doc. 89-6 (Dekmar Dep.) at 131-33)). Plaintiff's expert had no information or opinion that any of the 91 arrests of children age 11 and under were unlawful or unconstitutional. (Doc. 92 at 21-22 (citing Doc. 89-6 at 140-41).

The Court finds that, as to Plaintiff's expert's opinion, there is a significant error or oversight in a fundamental premise applied by the expert, Louis Dekmar, in that he erroneously drew conclusions about the lack of watch commander approval on reports for the full five year period studied (2014 to 2019), when the policy at issue here, Policy 1204.7 requiring watch commander approval, only took effect **one** year before K.R.'s arrest in 2019. Mr. Dekmar reviewed 91 reports consisting of all OPD arrests of children 11 and under from 2014 until the date of K.R.'s arrest on September 19, 2019, and he analyzed whether watch commander approval was obtained for those arrests. (Doc. 89-6 at 152; *see also* Doc. 89-2 at 88-91, 126)).

However, as Mr. Dekmar acknowledged, Policy 1204.7 only went into effect on August 28, 2018—slightly more than a year before K.R. was arrested—and the previous policy (Policy 1204.6) did not require watch commander approval to arrest a juvenile. (*See* Doc. 91-4). Such approvals therefore would not be required to be contained in the reports. Thus, to the extent that Mr. Dekmar determined that none of the reports between 2014 and August 28, 2018 "evidenced watch commander approval," this conclusion fails to support Plaintiff's claim that City had a "widespread pattern of abuse" of failing to obtain watch commander approval because no such approval was required under the previous policy (which Mr. Dekmar testified he did not receive or review); thus, the omission of watch

commander approval before August 28, 2018 he conceded "wouldn't be of any significance." (Doc. 89-6 at 152-53).[42]

To establish municipal liability under *Monell,* there must be evidence of a practice "so pervasive as to be the functional equivalent of a formal policy" that would either (a) demonstrate policy or custom or (b) demonstrate an obvious need to train in that particular area. Out of the 91 reports on which Plaintiff's expert relies, for the year between Policy 1204.7's enactment (August 28, 2018) and K.R.'s arrest (September 19, 2019), seven juveniles aged eleven and under were arrested, and three of those reports specifically documented watch commander approval. (Doc. 89-6 at 153). The four reports that did not specifically document watch commander approval during the relevant time period were so *few* that they cannot as a matter of law constitute the "pervasive" practice of "unconstitutionality" which would serve as a basis for *Monell* liability. Therefore, the Court will grant summary judgment to the City on Plaintiff's *Monell* claim that City had a "widespread pattern of abuse" in failing to obtain watch commander approval. *See Board of Cnty. Com'rs of Bryan County, Okl.*, 520 U.S. 397, 407-08 (1997) (without proof that the municipal entity

---

[42] Plaintiff's expert, Mr. Dekmar, also admitted that Policy 1204.7 did not require that the written reports include specifically that watch commander approval be documented but rather required only that watch commander approval be *obtained* (and not necessarily put in the report). (Doc. 89-6 at 134-36) ("I'm not prepared to assume that every time one isn't documented—and there's a couple that are, but I'm not suggesting that of the 91, all of those didn't."); *see* Doc. 89-2 at 92 (Chief Rolon: "Please note that although it may have not been documented, it doesn't mean that the watch commander approval was not obtained.").

was aware of a prior incidents in which constitutional rights were similarly violated, liability for failure to train will not be found).

As a final point, the City argues in its Reply that Plaintiff's Response fails to address the City's arguments for summary judgment on her *Monell* claim that the City allegedly "ratified" Officer Turner's unlawful action—when the City actually did the opposite by beginning a comprehensive Internal Affairs investigation immediately. The IA investigation resulted in Officer Turner's termination and the sanction for Sergeant Andreacchi. (Doc. 118 at 2 & n.2, n.11 (citing Doc. 89-2 at 70-71, 76-78).

The Court finds that summary judgment is warranted without further analysis to the extent Plaintiff alleges a *Monell* claim based on the City's alleged "ratification," "endorsement," or "failure to take seriously" the arrest of K.R. by Officer Turner—in light of Chief Rolon's institution of the IA investigation resulting in termination ("revocation of reserve status") for Officer Turner—because Plaintiff has failed to respond to the City's arguments (Doc. 92 at 23-24) on this issue.

Accordingly, the City's Motion for summary judgment on Plaintiff's *Monell* claims will be granted.

## CONCLUSION

For the reasons set forth in detail above, Officer Turner will be denied qualified immunity and Officer Ramos will be granted qualified immunity on

Plaintiff's claims for the false arrest and handcuffing of K.R. pursuant to the arrest (Counts I and II). Both Officers Turner and Ramos will be granted summary judgment on Plaintiff's claim for malicious prosecution because K.R. was arrested without a warrant, arraignment, or indictment. Summary judgment on Plaintiff's claims of supervisory liability will be granted to Sergeant Andreacchi and Chief Rolon (Count IV). Summary judgment will also be granted on Plaintiff's claims for *Monell* liability (Count V) against the City.

Based on the foregoing, it is ordered as follows:

1.　　Defendant Turner's Motion for Summary Judgment (Doc. 89) is **DENIED** in part as to Plaintiff's claims for false arrest and excessive force and **GRANTED in part** as to the malicious prosecution claim.

2.　　Defendants Officer Ramos and Sergeant Andreacchi's Motion for Summary Judgment (Doc. 90) is **GRANTED** on all claims.

3.　　Defendants the City of Orlando and Chief Rolon's Motion for Summary Judgment (Doc. 92) is **GRANTED**.

4.　　The City and Chief Rolon's Motions to Exclude the Opinion of Louis Dekmar (Doc. 91) and to Strike Dekmar's Supplemental/Rebuttal Opinion (Doc. 109) are **DENIED** as moot.

**DONE** and **ORDERED** in Chambers, in Orlando, Florida on August 15, 2025.

/s/ Anne C. Conway_____
Anne C. Conway
United States District Judge

Copies furnished to:

Counsel of Record